Bill and Louise Hinkle filed an action, alleging promissory fraud and breach of an oral contract, against Cargill, Inc.[1] ("Cargill"), *Page 1217 
and against its employee, Homer Griffin. According to the Hinkles, Cargill breached an oral contract to provide chickens for the Hinkles' newly constructed chicken house until the 20-year construction loan was repaid. The Hinkles also alleged that Griffin committed promissory fraud when he represented that Cargill would provide chickens for the duration of the loan, and the Hinkles alleged that Cargill should be held liable for this fraud. The trial court entered a summary judgment for all three defendants. The principal issues are whether the alleged oral contract is void under the Statute of Frauds, Ala. Code 1975, § 8-9-2, and whether the Hinkles have presented substantial evidence of intent not to perform the alleged promise and have thereby supported their promissory fraud claim.
In reviewing a summary judgment, this Court applies the same standard as the trial court. DuPont v. Yellow Cab Co. ofBirmingham, Inc., 565 So.2d 190 (Ala. 1990). The trial court, and this Court on appeal, must view all of the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. If a reasonable doubt exists, it is to be resolved in favor of the nonmoving party. Kenai Oil Gas, Inc. v. Grace PetroleumCorp., 512 So.2d 1347 (Ala. 1987).
Applying these rules, we find the record to reveal the following:
Cargill obtains eggs for sale by contracting with producers such as the Hinkles to place its chickens in houses owned and operated by the producers and then to purchase eggs from the producers. About 1980, Cargill intended to expand its poultry operations in Alabama. Cargill began with about 250,000 chickens in North Alabama in 1979, and at one point told Griffin to increase the number to 2,500,000.
The Hinkles had been working as independent egg producers for other companies since about 1963. About 1979, the Hinkles found themselves without a contract to produce eggs for any company. Mr. Hinkle contacted Griffin and inquired about Cargill's need for egg producers. Cargill required its egg producers to use modern, cage-type chicken houses with a 60,000-chicken capacity. The Hinkles owned a floor-type chicken house with a capacity of 8,000. Griffin provided Hinkle with Cargill's specifications for a cage-type chicken house with a capacity of 60,000 and related equipment. The projected cost was approximately $280,000. Griffin also provided Hinkle with estimates of the income from the proposed house.
Hinkle discussed the venture with his wife and inquired at a local bank about financing for a $240,000 construction loan. The local bank offered a loan of $240,000 to be repaid over a 7-year period. Hinkle refused this offer, however, because the estimates provided by Griffin did not show enough income to allow repayment of the construction loan within 7 years. The Hinkles decided against construction of Cargill's proposed chicken house and communicated this decision to Griffin.
According to Mr. Hinkle, Griffin contacted him a few weeks later and told him that Cargill had investigated the Hinkles' ability to obtain a construction loan with a longer term for repayment. Hinkle also testified in his deposition that Griffin represented to the Hinkles that, if they constructed the proposed chicken house and served satisfactorily as egg producers for Cargill, then Cargill would supply chickens for the proposed chicken house until the long-term construction loan was repaid. This alleged representation is the basis for both the contract claim and the fraud claim, and the evidence regarding it will be set forth in detail later in the opinion. After this discussion, the Hinkles borrowed $240,000 from the Federal Land Bank, to be repaid over a 20-year period, and constructed the proposed chicken house to meet Cargill's specifications. The Hinkles also testified that the terms of the 20-year loan were known to Griffin.
After the construction of the chicken house, Cargill supplied the Hinkles with the first flock of chickens. Along with the chickens, Cargill presented a written contract that covered Cargill's obligations to supply food and medicine for the chickens *Page 1218 
and to purchase the eggs that the Hinkles gathered and delivered to Cargill. The record includes a written contract that, the parties have agreed, is similar to the first contract. According to the parties and the language of the similar contract, the first written contract included a merger clause essentially as follows:
 "This contract represents the entire Agreement between the parties, and no covenants, warranties (express or implied) conditions or representations shall be binding on the parties unless expressly set out herein."
The Hinkles read the contracts and noted the merger clause. According to the Hinkles, before signing the first written contract, they questioned Griffin regarding the effect of the merger clause on Griffin's oral representation of Cargill's commitment to supply chickens until the construction loan was repaid. The Hinkles testified that Griffin told them that the written contract was only a "working contract" that covered the particular flock of chickens and that the written contract did not affect his oral representation that Cargill would continue to supply chickens until the construction loan was repaid. The Hinkles signed the contract.
For several years, Cargill supplied chickens to the Hinkles. With each new flock, the Hinkles signed a new contract with a merger clause similar or identical to the one quoted above. Cargill also continued to supply the feed and medicine and to purchase the eggs that the Hinkles gathered and delivered to Cargill. The Hinkles used part of the income from this arrangement to pay the construction loan obligations. The parties apparently enjoyed a mutually beneficial relationship for several years.
About 1984, Griffin resigned from Cargill's employment. According to Griffin, he left because he was no longer certain that Cargill would perform as he had represented to many independent egg producers that it would. Even though Griffin resigned, Cargill and the Hinkles continued with their arrangement until 1988. In 1988, Cargill sold its chickens to another poultry business. In 1989, that poultry business removed the chickens from the Hinkles' chicken house. Cargill refused to supply any more chickens for the Hinkles' chicken house, and the Hinkles were without chickens for about 16 months. The Hinkles eventually acquired other chickens from another poultry business that paid a lower price per dozen eggs delivered. The Hinkles are not certain, however, that the other poultry business will continue to supply chickens for their house or that they will be able to meet the obligations of their construction loan.[2]
Because Cargill refused to perform according to its alleged oral commitment, the Hinkles filed an action alleging breach of an oral contract and promissory fraud. After a lengthy discovery process, Cargill filed a motion for summary judgment. The trial judge initially denied that motion, but later heard oral arguments, reconsidered, and entered a summary judgment for "all defendants." The trial court's order entering the summary judgment stated that "all defendants" were entitled to a summary judgment on the Hinkles' breach of contract claim because Alabama's Statute of Frauds, Ala. Code 1975, § 8-9-2, voids all agreements that cannot be performed within one year, unless they are evidenced by some writing that recites the consideration and that is signed by the party against whom enforcement is sought. The trial court also determined that the Hinkles' breach of contract claim failed for indefiniteness. With regard to the Hinkles' promissory fraud claim, the trial court determined that a fraud action cannot be based on an oral agreement that is void under the Statute of Frauds and that the Hinkles had failed to produce substantial evidence that Cargill or Griffin committed *Page 1219 
promissory fraud.[3] The Hinkles had argued that Cargill was estopped from asserting the Statute of Frauds as a defense to the alleged oral contract. The Hinkles also argued that they presented substantial evidence of a genuine issue of material fact relating to the elements of promissory fraud. The Hinkles appealed, and they repeat those arguments in this Court.
The Statute of Frauds, Ala. Code 1975, § 8-9-2, applies to "[e]very agreement which, by its terms, is not to be performed within one year from the making thereof[,]" and provides that any such "agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing." This Court has recognized that "[t]he purpose and intent of the Statute of Frauds is to prevent fraud, and not to aid in its perpetration." Dean v. Myers, 466 So.2d 952, 955
(Ala. 1985) (citations omitted; quoting 73 Am.Jur.2d Statute ofFrauds § 562 (1975)). To avoid the injustice that would arise if the Statute of Frauds could be used to avoid liability for a fraudulent act or representation, this Court has recognized limited exceptions to its operation. Darby v. Johnson,477 So.2d 322 (Ala. 1985).
In Darby, this Court reviewed an action for specific performance of an agreement to purchase land. Although focusing on a statutory part-performance exception, this Court noted the existence of another exception to the Statute of Frauds. This second exception is based on the doctrine of estoppel and applies to situations where the Statute of Frauds is allegedly being used to perpetrate a fraud. Reviewing Spencer v. Spencer,254 Ala. 22, 47 So.2d 252 (1950), a case involving an oral contract made upon consideration of marriage, the Darby Court stated:
 "The [Spencer] Court stated that a party could be estopped from asserting the Statute of Frauds if the promise was made fraudulently with no intention of performing it. However, the [Spencer] Court further explained the requirements for nullifying a Statute of Frauds defense on the basis of fraud:
 " '[A]ctual and positive fraud, inherent in the transaction involved, must be shown, otherwise the rule does not operate. A mere failure or refusal to perform an oral contract, within the statute, is not such fraud, within the meaning of this rule, as will take the case out of the operation of the statute, and this is ordinarily true even though the other party has changed his position to his injury.' 37 C.J.S. Statute of Frauds § 217, at 713-14.
"254 Ala. at 27, 47 So.2d at 255."
Darby, 477 So.2d at 326.
In Nelson Realty Co. v. Darling Shop of Birmingham, Inc.,267 Ala. 301, 101 So.2d 78 (1957),[4] the Court stated the effect of fraud on the common law's parol evidence rule and Alabama's Statute of Frauds:
 " 'Where parties have entered into a contract in writing, in the absence of fraud, the law intends, that the writing contains the entire agreement, and consequently, will exclude all parol evidence tending to show that there were other items not embraced. . . . If, therefore, a party would show, that the contract contains other terms than the writing indicates, it is incumbent on him to lay a foundation for the introduction of such proof. . . . But neither the common law, which accords to writings a higher dignity in the scale of evidence, than mere oral statements, nor the statute of *Page 1220 
frauds and perjuries, inhibit[s] the admission of parol evidence to vary, or totally defeat, a written contract tainted with fraud.' "
267 Ala. at 309, 101 So.2d at 85, quoting Kennedy's Heirs Executors v. Kennedy's Heirs, 2 Ala. 571, 588 (1841).
The overall effect of these rules and their exceptions is that the Hinkles would have to establish the elements of their promissory fraud claim in order to raise an estoppel against Cargill's use of the Statute of Frauds and the parol evidence rule to defeat the contract claim. Therefore, we shall address the fraud claim in order to decide both it and the contract claim.
The elements necessary for recovery in a fraud action are: (1) a false representation by the defendant; (2) of a material fact; (3) reliance by the plaintiff; and (4) damage as a proximate result. General Motors Acceptance Corp. v. Covington,586 So.2d 178, 181 (Ala. 1991).
 "If a fraud action is based on a promise to perform an act in the future, the proof of the falsity of the representation requires proof that, at the time the promise was made, 'the promisor had no intention of carrying out the promise, but rather had a present intent to deceive.' Purcell Co. v. Spriggs Enterprises, Inc., 431 So.2d 515, 519 (Ala. 1983), appeal after remand, 451 So.2d 801 (Ala. 1984)."
United Companies Financial Corp. v. Brown, 584 So.2d 470, 473
(Ala. 1991) (brackets in Brown); Old Southern Life Ins. Co. v.Woodall, 295 Ala. 235, 326 So.2d 726 (1976); Nelson v. DarlingShop of Birmingham, Inc., supra. In Walker v. Woodall, 288 Ala. 510, 262 So.2d 756 (1972), the Court explained the requirement of proof of intent not to perform as an element of promissory fraud:
 "In order for a promise to constitute a fraudulent representation it is necessary that it have been made with the intent not to perform the act. . . .
 "In Turner v. Biscoe, 141 Tex. 197, 171 S.W.2d 118, 119, the Texas court stated:
 " 'The governing principles of law are familiar. A person's intention is a matter of fact. When a promise is made the promisor expressly or by necessary implication states that he then has a present intention to perform, and if such intention does not actually exist at that time, a false statement of fact has been made upon which fraud may be predicated. The gist of the fraud is deception as to an existing fact, namely, the state of the promisor's mind. That fact may be established by circumstantial evidence taken in connection with the breach, but cannot be established by the breach alone.'
 "Of course, mere failure to perform is not of itself evidence of intent not to perform at the time the promise or contract was made. If it were, a mere breach of contract would be tantamount to fraud."
288 Ala. at 513, 262 So.2d at 759 (citations omitted).
Cargill argues that a fraud action cannot be based on the breach of an unwritten contract that is void under the Statute of Frauds. As the above-cited authorities show, however, the Statute of Frauds does not bar proof of a fraud committed by means of a promise that ordinarily could not be enforced as a contractual promise because of the Statute of Frauds. Furthermore, "it is well settled in Alabama that fraud may be predicated upon a breach of contract which is void, because not in writing, where the contract was made for the purpose of perpetrating the fraud." Caron v. Teagle, 408 So.2d 494, 496
(Ala. 1981).
The evidence of the alleged misrepresentation includes the following testimony from Mr. Hinkle in his deposition:
 "A. [During the initial discussion about a long-term loan, Griffin] told me that Cargill was a new company in the area and they wanted to start out with about three hundred thousand birds out of the Horton operation and they needed to get people to grow that many birds at that time and they planned on being here for many years to come, and if I wanted to borrow the money and build a layer house that they were going to be here — *Page 1221 
If we wanted to finance the buildings that they were going to be here until these buildings were paid for
". . . .
 "Q. Up until what point in time was everything going as you expected it to?
"A. March of '88.
 "Q. Prior to that time had you had any indication from any source that what Homer Griffin had told you orally back in 1980 may be subject to change?
"A. No, sir.
". . . .
 "Q. Do you have any reason to think that what [Griffin] told you wasn't true at the time he told it to you?
"A. No, sir.
". . . .
 "Q. . . . [T]ell me everything you contend that Homer Griffin or any other Cargill or Sunny Fresh person has said in the past that you contend was false.
 "A. I don't contend that they made any false statements.
". . . .
 "Q. . . . Tell me everything that anyone from Cargill has done that you complain about, that you have a problem with that could in any way form the basis for your suit. And I know that you have told me some things prior to this. I'm asking you to review those with me now so we can go back through them.
 "A. I told you that they made a long-term twenty-year deal with me and they broke that deal."
Neither this nor any of the other evidence in support of the fraud allegation shows that Griffin had a present intent, at the time he made the alleged representation that Cargill would continue to keep chickens in the chicken houses, not to perform that promise. There was evidence that Griffin tried to obtain approval from Cargill to enter into longer-term contracts than the one-year flock contracts. This evidence would support a finding that Griffin knew that Cargill would not bind itself to a 20-year commitment or any other commitment in excess of a year. However, it does not show an intent not to continue providing chickens and purchasing eggs. On the contrary, all of the evidence indicates that Cargill was expanding its operations in Alabama, that they were profitable, and that it intended to continue them. The evidence indicates that it was only in 1987 or 1988, when concerns about the effects of cholesterol caused a significant decline in the consumption of eggs, that Cargill first began to reduce its operations.
Moreover, Hinkle signed six or seven contracts with merger clauses stating that no representations would be binding on Cargill unless set out in those contracts. The Hinkles are thus attempting to show an oral commitment for 20 years that would be in direct contradiction to the successive written contracts, which include no such commitment.
This Court has decided a case factually similar to this one but with a significant difference. Marshall Durbin Farms, Inc.v. Landers, 470 So.2d 1098 (Ala. 1985).
 "On June 29, 1982, Durbin's representatives entered into an agreement with Mr. Landers which provided, in part, that if the Landerses would make certain improvements to their chicken houses, . . . and if they would perform well as growers, then Durbin would continue to supply them with chickens. The agreement provided:
 " '. . . Birds will be placed in house if the above list is completed. Birds placement will be one batch at a time depending on grower record. Record must be average or above.'
 "Relying on the agreement, the Landerses made the requisite renovations. Durbin thereafter supplied them with a batch of chickens on July 20, 1982. About August 23, 1982, the Landerses were informed that Durbin planned to discontinue supplying chickens to growers in Lawrence County, including them."
470 So.2d at 1100. The Landerses brought an action alleging fraud, and this Court affirmed a judgment in their favor. The opinion cites evidence that Durbin, at the time it executed the agreement with the *Page 1222 
Landerses, planned to discontinue operations in their area.
Here there is no such evidence. On the contrary, the parties continued in a mutually beneficial relationship for seven or eight years. The evidence would support no finding other than that, when Griffin assured the Hinkles that Cargill would continue to do business with them for the full term of the loan, Griffin and Cargill intended to do exactly that and had no intent to deceive the Hinkles. The trial court thus correctly held, in light of the defendants' properly supported summary judgment motion, that the Hinkles had produced no substantial evidence to support either their fraud claim or their claim that Cargill was estopped by fraud to raise the Statute of Frauds or the parol evidence rule in defense of the contract claim. The judgment is therefore affirmed.
AFFIRMED.
HORNSBY, C.J., and ADAMS, STEAGALL and INGRAM, JJ., concur.
[1] The complaint also named Cargill's subsidiary, Sunny Fresh Foods, Inc., as a defendant, but the parties have not treated this entity separately from Cargill.
[2] During the years that the Hinkles were employed as one of Cargill's independent egg producers, the Hinkles refinanced the construction loan with another lending institution. This was done to obtain a lower interest rate. Cargill does not contend that the refinancing satisfied its alleged commitment to provide chickens until the Hinkles' construction loan was repaid.
[3] The Hinkles argue that the summary judgment in Griffin's favor was error because Griffin did not move for a summary judgment. The trial court initially denied Cargill's motion for summary judgment, but Cargill filed a renewed motion for summary judgment at the judge's suggestion. Griffin's lawyer was present at the oral argument of the renewed summary judgment motion, and it appears that the trial court treated Griffin as joining Cargill's motion. The court entered the summary judgment for "all defendants," giving reasons why the Hinkles are unable to recover from either defendant. Under the circumstances, the trial court did not err in treating Griffin as having joined Cargill's motion for summary judgment.
[4] Appeal after remand, 275 Ala. 598, 157 So.2d 23 (1963).