[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 49 
 I. Introduction
Harry Cole, Jr., sued Michael David Bruce for specific performance, to require Bruce to sell his stock in South Butler Medical Holdings, Inc. ("Medical Holdings"), to Cole as allegedly provided by a written
agreement among the two men and Medical Holdings. Bruce similarly counterclaimed against Cole for specific performance, to require Cole to sell his stock in Medical Holdings to Bruce as allegedly provided by an alleged oral agreement between only the two men. In the same counterclaim, Bruce also claimed against Cole for damages for Cole's alleged promissory fraud in allegedly entering the oral agreement with no intention of performing. In the course of the pleadings, Medical Holdings itself became Cole's co-plaintiff seeking to require Bruce to sell his stock in Medical Holdings to Medical Holdings itself as distinguished from Cole.
The opposing parties eventually filed cross-motions for summary judgment against each other, and the trial court entered summary judgment in favor of Cole and Medical Holdings and against Bruce on all claims. Specifically, the trial court entered summary judgment in favor of Cole and Medical Holdings on their respective claims for specific performance, ordered Bruce to sell his stock in Medical Holdings to Medical Holdings itself, and entered summary judgment against Bruce on the oral contract and promissory fraud theories asserted in his counterclaim. The only factual determinations on the merits expressly stated by the order are "there is [or there being] no genuine issue of material fact" and "[t]he Court finds no promissory fraud." Bruce appeals all of these adverse rulings; and we affirm the summary judgment as it applies to all claims.
 II. Facts — Substantive and Procedural
On November 2, 1998, Cole owned all of the 1,000 shares of stock issued by Medical Holdings. That same day, Cole sold Bruce 490 of those shares for the sum of $50,000. As part of the sale, Bruce and Cole signed a Restrictive Stock Transfer Agreement, which provides, in pertinent part:
"4. Retiring, Resigning or Terminated Shareholder.
 "In the event a Shareholder should voluntarily or involuntarily retire, resign, or terminate his employment with the corporation (said retiring, resigning or terminated stockholder being hereinafter referred to as the resigning stockholder) said resigning stockholder shall be obligated to sell his shares in the following manner:
"(a) Corporation's Obligation to Redeem *Page 50 
 "The Corporation shall be obligated to redeem and the resigning Shareholder shall be obligated to sell to the Corporation all shares of the Corporation owned by the resigning shareholder at the time of such resignation, retirement or termination of employment.
 "The purchase price and terms of any such purchase shall be as set forth in Paragraph 5 hereof.
"(b) Shareholders Option to Buy.
 "For a period of sixty (60) days after the applicable period for the redemption of the stock by the Corporation, as to any stock which is not redeemed by the Corporation for whatever reason from the resigning stockholder, the other Stockholders shall have an option to buy and the resigning stockholder shall be obligated to sell such stock in accordance with the price and terms as determined in Paragraph 5 herein.
". . . .
"5. Valuation
"(a) Purchase Price
 "The value, and for the purposes of the Agreement, the purchase price of each share of stock of the Corporation shall be determined by the Stockholders
of the Corporation in the manner provided herein; the Stockholders shall, on or about November 1 of each year, and at each other such times as they see fit, agree on the value of each share of common stock of the Company. It is agreed that the value of each share of common stock of the Company is as of this date, and until the next date when a new value is fixed by the parties, One Hundred and No/100 Dollars ($100.00). Attached hereto as Exhibit `A' is a [blank exemplar] Schedule of Values as fixed by the parties for the date indicated on the schedule, and such schedule shall be and is hereby made a part of this Agreement, and when duly executed, shall be in compliance with the requirements herein contained as to the fixing of the value of each share of common stock of the Company; that, except as otherwise provided in this Agreement, such value shall in no manner be altered; and that all assets, both tangible and intangible, if any, as well as liabilities, if any, of or upon the assets of the Company have been considered in determining value.
". . . .
"13. Entire Agreement.
 "This Contract contains the entire agreement of the parties hereto, and no modification, amendment, change or discharge of any term or provision shall be valid or binding unless signed by the party against who such provision is asserted." (Emphasis added.)
Exhibit "A" to the Restrictive Stock Transfer Agreement reads:
 "In accordance with the terms of Section 5 of the Restrictive Stock [Transfer] Agreement of South Butler Medical Holdings, Inc., executed and entered into by the undersigned parties as of November 2, 1998, the undersigned do hereby agree that the value of each share of common stock of the Company as of the first day of November 199_, is $ ___.
 "_____________________ L.S. Harry Cole, Jr.
 "_____________________ L.S. Michael David Bruce"
On November 2, 1998, the bylaws of Medical Holdings read, in pertinent part:
 "11. Number, Tenure and Qualifications: There shall be no less than one (1) Director nor more than ten (10) Directors of the Corporation. The Directors shall be elected at the annual meeting of the Stockholders and shall hold office for one (1) year until the next *Page 51 
annual meeting of the Stockholders and until their successors have been duly elected and qualified. The number of Directors may be increased or decreased from time to time by Amendment to the By-Laws, but no decrease shall have the effect of shortening the term of any incumbent Director. Directors need not be residents of the State of Alabama or Stockholders of the Corporation.
". . . .
 "19. Various Officers: The Officers of the Corporation shall be elected by the Board of Directors and shall be a President and Vice President. The Board of Director may also choose a Chairman of the Board of Directors, additional Vice Presidents, a Secretary and a Treasurer. All offices may be held by the same person.
". . . .
 "21. Removal: Any officer elected or appointed by the Board of Directors may be removed at will and at any time by the affirmative vote of the majority of all the Directors." (Emphasis added.)
On that same day, November 2, 1998, Cole and Bruce, as shareholders of all of the stock of Medical Holdings, elected Bruce a director, to serve with Cole, the only other director; and Cole and Bruce, as such directors, elected Cole as the president and Bruce as the secretary and the treasurer of the corporation.
The function and value of Medical Holdings was that it owned 61% (later 50%) of South Butler Medical Services, L.L.C. ("Medical Services"), which, in turn, wholly owned (subject to the debt for the purchase price) the Georgiana Hospital and affiliated clinics in Butler County. The only shareholder in Medical Services other than Medical Holdings was South Butler Medical Enterprises, Inc. ("Medical Enterprises"), which was wholly owned by Dr. Jeff Voreis of Butler County. Cole wholly owned still another related corporation, South Butler Medical Management, Inc. ("Medical Management"), which, by contract with Medical Services, managed the Georgiana Hospital and affiliated clinics. About the time of the November 2, 1998 transactions, both Medical Management and Medical Services severally employed Bruce as the chief financial officer of each.
Medical Holdings did not pay Bruce a salary or fringe benefits and did not prepare Internal Revenue Service W-2 forms for Bruce. Medical Management paid Bruce's salary, and Medical Services paid Bruce's health insurance premiums. Medical Holdings did not reimburse Medical Management or Medical Services any portion of Bruce's salary or fringe benefits.
According to Bruce's deposition testimony, two weeks after he and Cole signed the Restrictive Stock Transfer Agreement, Cole orally broached the subject of a "put-call" agreement. According to Bruce, the "put-call" proposal by Cole was that, if either of them offered to purchase all of the other's shares in Medical Holdings for a stated price, the offeree could decline to sell his shares and could demand to buy all of the offeror's shares for that same stated price per share.[1] Bruce testified that he orally accepted Cole's "put-call" proposal, and that, in reliance on this alleged oral "put-call" agreement, Bruce purchased his home.
Cole denied ever discussing a "put-call" arrangement. He stated that he never intended to sell his stock to Bruce. *Page 52 
Indeed, Cole testified, the terms of the loans for the purchase of the Georgiana Hospital and clinics provided that the lending bank could call the loans, if Cole, an individual guarantor of the loans, were to sell his stock to anyone.
According to Bruce's deposition testimony, he, Cole, and Dr. Voreis met in July 1999 to discuss the value of the Georgiana Hospital and affiliated clinics in order for each man to prepare a personal financial statement to submit to the bank which had lent Medical Services the money to buy the hospital and clinics. The bank required the statements of Cole and Dr. Voreis, who had personally guaranteed the loan, but did not require one of Bruce, who submitted one nonetheless. The three men valued the hospital and clinics at $1,000,000. According to Bruce, he and Cole agreed at this time that their total stock in Medical Holdings (as 50% owner of Medical Services, which wholly owned the million-dollar hospital and clinics) had a value of $500,000 or $500 per share. Bruce and Cole each separately prepared, signed, and submitted to the lending bank a financial statement valuing his own Medical Holdings stock at $250,000. Each financial statement bore a cover certification, which reads in pertinent part:
 "This is to certify that the information set forth on the attached generic Personal Financial Statement, dated 6/30/99 is true and correct, and I hereby request that said financial statement be accepted by [the Bank] as if it were addressed to you and the certification therein were made to you.
 "This financial statement has been provided to [the Bank] for the purpose of obtaining credit. The bank is authorized to confirm any of the information set forth therein, and any person having knowledge regarding such information is hereby authorized to disclose that information to you. . . .
 "7/21/99 ______________(sign) "Date"
(Emphasis added.)
On August 2, 1999, Cole verbally terminated Bruce as an employee of Medical Management and Medical Services. In that same month, Cole demanded that Bruce sell Cole all of Bruce's stock in Medical Holdings for $50,000 pursuant to the Restrictive Stock Transfer Agreement, and Bruce demanded that Cole sell Bruce all of Cole's stock in Medical Holdings for the same price pursuant to the alleged oral put-call agreement. On September 8, 1999, Cole sued Bruce for specific performance of the Restrictive Stock Transfer Agreement, and on January 10, 2000, Bruce countersued Cole for specific performance of the oral put-call agreement and for promissory fraud in entering the put-call agreement without intending to honor it.
On March 16, 2000, Bruce received a written notice of a special meeting of the shareholders of Medical Holdings scheduled for April 3, 2000. On April 3, 2000, at the special meeting of the shareholders, Cole voted his 510 shares of stock to terminate Bruce as a director of Medical Holdings. Bruce voted his 490 shares of stock against terminating himself as a director of Medical Holdings. By that majority vote, Bruce was terminated as a director, and Cole was left as the only remaining director. Cole then voted his 510-share majority of stock to decrease the number of corporate directors from two to one, and Bruce voted his 490-share minority against the decrease. Finally, Cole voted his majority in favor of, and Bruce voted his minority in opposition to, reelecting Cole as the sole director.
On April 5, 2000, at a special meeting of the new single-director board of directors *Page 53 
of Medical Holdings, Cole terminated Bruce as secretary and as treasurer of Medical Holdings. Cole then authorized Medical Holdings to redeem Bruce's stock in accordance with the Restrictive Stock Transfer Agreement.
By letter dated April 18, 2000 and signed by Cole, Medical Holdings notified Bruce of his termination as secretary and as treasurer of that corporation. By that same letter, pursuant to the Restrictive Stock Transfer Agreement, Medical Holdings demanded to redeem all of Bruce's stock for $100 per share, a total of $49,000 for all 490 shares. Medical Holdings tendered the $49,000 in forms of payment allowed by paragraph 5(b) of the Restrictive Stock Transfer Agreement. Bruce refused to sell his stock for $100 per share, but agreed to sell his stock for a total of $250,000. Medical Holdings refused to pay Bruce $250,000.
On June 23, 2000, Cole amended his complaint and added Medical Holdings as a plaintiff seeking specific performance of the stock redemption provisions of the Restrictive Stock Transfer Agreement. That same day, Cole and Medical Holdings filed a motion for a summary judgment and submitted a narrative summary of the undisputed facts. Cole also answered Bruce's counterclaim. On July 20, 2000, answering the amended complaint, Bruce asserted that Cole and Medical Holdings lacked standing to seek specific performance of the Restrictive Stock Transfer Agreement because, Bruce alleged, he had not been terminated from his positions as director, secretary, and treasurer of Medical Holdings. Alternatively, Bruce answered that Cole lacked standing to seek specific performance because Cole had not offered to purchase Bruce's stock after Bruce had been terminated as director, secretary, and treasurer of Medical Holdings. On July 26, 2000, Bruce moved for a partial summary judgment on Cole's claim for specific performance.
On August 24, 2000, the trial court entered a summary judgment in favor of Cole and Medical Holdings and ordered Bruce to convey his stock to Medical Holdings within 30 days for the sum of $49,000 ($100 per share). Bruce moved to alter, to amend, or to vacate the judgment, submitted a supporting brief, and moved for a stay of the judgment. The trial court denied the motion to stay, but amended the judgment by extending the 30-day period for Bruce to convey his stock to Medical Holdings. The trial court denied all other post-judgment relief.
On appeal, Bruce states his issues as follows:
 "1. Did the trial court err in granting the motion for summary judgment of . . . Cole and Medical Holdings on their two counts of specific performance where the evidence presented to the trial court established that there existed genuine issues of material fact with respect to the meaning and application of the Restrictive Stock Transfer Agreement entered into between . . . Cole and . . . Bruce?
 "2. Did the trial court err in granting the motion for summary judgment of . . . Cole and Medical Holdings on the counterclaim of . . . Bruce . . . where sufficient evidence was presented to the trial court to establish that . . . Bruce was entitled to the relief sought, namely, enforcement of the parties' agreement that . . . Bruce's stock was worth $250,000.00 or some other sum to be determined by the jury, a determination by the jury that the attempted termination of . . . Bruce was ineffectual, and enforcement of the Put-Call agreement entered into between Bruce and Cole?
 "3. Did the trial court err in granting the motion for summary judgment *Page 54 
on the counterclaim of . . . Bruce for promissory fraud where the evidence presented to the trial court established that there existed genuine issues of material fact with respect to whether . . . Cole intended to deceive . . . Bruce when they entered into the Put-Call agreement?
 "4. Did the trial court err in denying the motion for partial summary judgment of . . . Bruce on the claim of . . . Cole seeking specific performance (Count I of the Plaintiff's Complaint) where the evidence presented to the trial court established that . . . Cole lacked standing to compel transfer of . . . Bruce's stock and where there is no legal or contractual obligation in . . . Bruce to transfer his stock to . . . Cole?"
This opinion will select the issues that are determinative and will address them in logical order.
 III. Law and Analysis
Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala.R.Civ.P., and Dobbs v. ShelbyCounty Econ. Indus. Dev. Auth., 749 So.2d 425 (Ala. 1999). The court must accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable doubts in favor of the nonmoving party. System Dynamics Int'l, Inc. v. Boykin, 683 So.2d 419
(Ala. 1996). "[W]here the evidence is in conflict, the issue must [be tried to the fact-finder]." Kitchens v. Winn-Dixie Montgomery, Inc.,456 So.2d 45, 47 (Ala. 1984). In reviewing a summary judgment, an appellate court, de novo, applies the same standard as the trial court.Dobbs, supra.
 III.A. Claims by Cole and Medical Holdings
Cole's claim for specific performance sought to force Bruce to sell all of his stock to Cole individually. The claim of Medical Holdings for specific performance sought to force Bruce to sell all of his stock to Medical Holdings as a corporate entity, as distinguished from Cole as an individual.
While the trial court purported to grant summary judgment in favor of both Cole and Medical Holdings on these claims against Bruce, the trial court granted only the specific performance sought by Medical Holdings. Precisely, the trial court ordered only that Bruce sell his stock to Medical Holdings as distinguished from Cole. The trial court did not grant Cole individually the relief he sought in his claim against Bruce for specific performance.
Therefore, if the trial court erred in purporting to grant summary judgment in favor of Cole individually on his claim for specific performance, any such error is harmless. Thus, in determining the propriety of the specific performance ordered by the trial court, this opinion will analyze only the claim filed by Medical Holdings seeking that relief.
Medical Holdings sought specific performance of these provisions of the Restrictive Stock Transfer Agreement:
"4. Retiring, Resigning or Terminated Shareholder.
 "In the event a Shareholder should voluntarily or involuntarily retire, resign, or terminate his employment with the corporation (said retiring, resigning or terminated stockholder being hereinafter referred to as the resigning stockholder) said resigning stockholder shall be obligated to sell his shares in the following manner: *Page 55 
"(a) Corporation's Obligation to Redeem
 "The Corporation shall be obligated to redeem and the resigning Shareholder shall be obligated to sell to the Corporation all shares of the Corporation owned by the resigning shareholder at the time of such resignation, retirement or termination of employment.
 "The purchase price and terms of any such purchase shall be as set forth in Paragraph 5 hereof." (Emphasis added.)
Bruce advances several arguments for the proposition that the condition precedent to the right of Medical Holdings to redeem his stock did not occur. The condition precedent would be that Bruce "involuntarily . . . terminate[d] his employment with the corporation."
Bruce first argues that he was not a Medical Holdings employee to whom the term "employment" could be attributed at all. However, § 10-2B-1.40(9), Ala. Code 1975, includes corporate officers within the definition of "employee." Therefore, as both the secretary and the treasurer of Medical Holdings, Bruce was a Medical Holdings employee to whom the term "employment" could be attributed.
Bruce next argues that he was not effectively terminated as an officer in accordance with the bylaws of Medical Holdings. This argument depends on his prefatory argument that he was not effectively removed as a director. While the bylaws of Medical Holdings did not contain a provision for the removal of a director, the authority for such action is supplied by § 10-2B-8.08(a), Ala. Code 1975, which provides that "[t]he shareholders may remove one or more directors with or without cause unless the articles of incorporation provide that directors may be removed only for cause." Thus, Bruce was effectively removed as a director on April 3, 2000 by a majority vote of the stockholders. Accordingly, the April 5, 2000 decrease in directorships from two to one was effective because the directorship eliminated was vacant at that time. Consequently, as the sole director of Medical Holdings, Cole could and did terminate Bruce as an officer of Medical Holdings on April 5, 2000.
Bruce next argues that, in being discharged as he was from his offices of secretary and treasurer of Medical Holdings, he did not "involuntarily . . . terminate his employment with the corporation." He argues that the verb terminate introduces an ambiguity into the Restrictive Stock Transfer Agreement that can reasonably be interpreted to mean that it contemplates only his voluntarily terminating his own employment. This argument is foreshadowed by Bruce's testimony to his notion of the definition of "involuntarily": "What I define as involuntarily as stated before, involuntary means I decide to quit. . . . I decide to leave for whatever reason I want. . . ."
The question of whether a contract is ambiguous must be decided by the court as distinguished from the fact-finder. Universal Underwriters Ins.Co. v. Thompson 776 So.2d 81 (Ala. 2000). "`[T]he words of a contract are to be given their ordinary meaning.'" Thompson, 776 So.2d at 84 (quotingBoWing Office Sys., Inc. v. Johnson, 744 So.2d 915, 918 (Ala.Civ.App. 1999)). The court will so interpret a contract as to reconcile and to enforce all of its terms and not to ignore or to disregard any of its terms so long as such an interpretation is not patently unreasonable.See Yu v. Stephens, 591 So.2d 858 (Ala. 1991), and Federated Guar. LifeIns. Co. v. Dunn, 439 So.2d 1283 (Ala.Civ.App. 1983). If, interpreted according to *Page 56 
these rules, a contract is not reasonably subject to conflicting meanings, it is not ambiguous. Id. An unambiguous "`contract must be enforced as written.'" Thompson, 776 So.2d at 84 (quoting BoWing OfficeSys., Inc., 744 So.2d at 918).
Bruce's argument that the Restrictive Stock Transfer Agreement can be interpreted to contemplate only his voluntarily terminating his own employment disregards or ignores, contrary to the rules of construction, the express term "involuntarily." Therefore, this Court must reject this argument. Rather, this Court holds that Bruce's discharge from his corporate offices is within the meaning of the expression "involuntarily. . . terminate his employment with the corporation."
Therefore, the condition precedent to the right of Medical Holdings to redeem Bruce's stock did occur in that Bruce did "involuntarily . . . terminate his employment with the corporation." The next issue is whether the tender by Medical Holdings to redeem the stock was adequate.
Medical Holdings tendered $49,000 for Bruce's 490 shares. Bruce, however, argues that the agreement between him and Cole to value the stock of each at $250,000 on the financial statement each submitted to the bank constituted the valuation "of each share of the common stock of the Company" contemplated by paragraph 5(a) of the Restrictive Stock Transfer Agreement. While the record does contain substantial evidence that Bruce and Cole did agree that each would ascribe a total value of $250,000 to his stock on the financial statement each submitted to the bank, the record does not contain substantial evidence that Bruce and Cole agreed that this agreement would constitute the valuation contemplated by paragraph 5(a) of the Restrictive Stock Transfer Agreement. On the contrary, the evidence is undisputed that Bruce and Cole did not memorialize any such valuation as expressly required by paragraph 5(a).
The tender by Medical Holdings of $100 per share for Bruce's stock was in accordance with the only valuation the parties ever adopted pursuant to paragraph 5(a). Therefore, the tender was adequate to bind Bruce to sell his stock to the corporation.
The valid termination of Bruce from his employment by Medical Holdings quickened its right to redeem all of Bruce's stock, and Medical Holdings duly tendered the proper sum to Bruce to enforce the redemption. Therefore, the trial court correctly entered a summary judgment in favor of Medical Holdings on the issue of specific performance.
 III.B.1. Bruce's Claim for Specific Performance
Bruce first claimed against Cole for specific performance of the alleged oral put-call agreement. By that claim Bruce sought to enforce Cole's alleged oral promise to sell all of his stock in Medical Holdings to Bruce for whatever price Cole himself offered to Bruce to buy all of Bruce's stock. Bruce alleged that Cole had offered to buy all of Bruce's stock for $50,000. Bruce therefore sought a judgment compelling Cole to sell all of his stock to Bruce for the price per share equivalent to Cole's offer.
The Alabama Statute of Frauds, § 8-9-2, Ala. Code 1975, provides in pertinent part:
 "In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person *Page 57 
by him thereunto lawfully authorized in writing:
". . . .
 "(8) Notwithstanding Section 7-8-113, every agreement for the sale or purchase of securities other than through facilities of a national stock exchange or of the over-the-counter securities market."
The "Alabama Comment" to § 7-8-113, Ala. Code 1975, explains in pertinent part:
 "Thus an agreement by a shareholder of a closely held corporation to sell all or a part of his shares continues to be subject to the statute of frauds, notwithstanding the elimination of a statute of frauds requirement as to transactions in the organized securities markets."
The alleged oral put-call agreement, if it truly existed at all, was an "agreement for the sale or purchase of securities other than through facilities of a national stock exchange or of the over-the-counter securities market," § 8-9-2(8). Therefore the alleged oral put-call agreement was void and unenforceable. Bruce seems to concede as much in his briefs to this Court. Therefore, the trial court properly entered a summary judgment against Bruce on his claim for specific performance.
 III.B.2. Bruce's Claim for Promissory Fraud
Undeterred, Bruce insists that the trial court erred in entering a summary judgment against him on his claim for promissory fraud. He argues that he relied to his detriment on Cole's oral promise, which, Bruce says, Cole made with the then-existing intent not to perform and with a then-existing intent to deceive. See Porter v. Hook, 554 So.2d 382,384-85 (Ala. 1989), for the essential elements of promissory fraud.
In the promissory fraud case of Hinkle v. Cargill, Inc., 613 So.2d 1216,1220 (Ala. 1992), this Court wrote:
 "Cargill argues that a fraud action cannot be based on the breach of an unwritten contract that is void under the Statute of Frauds. As the above-cited authorities show, however, the Statute of Frauds does not bar proof of a fraud committed by means of a promise that ordinarily could not be enforced as a contractual promise because of the Statute of Frauds. Furthermore, `it is well settled in Alabama that fraud may be predicated upon a breach of contract which is void, because not in writing, where the contract was made for the purpose of perpetrating the fraud.' Caron v. Teagle, 408 So.2d 494, 496 (Ala. 1981)."
Indeed, in the promissory fraud case of US Diagnostic v. ShelbyRadiology, P.C., 793 So.2d 714 (Ala. 2000), addressing a promise void by operation of the Statute of Frauds, a plurality of this Court held that the alleged promisor-defendant's denial that he made the alleged promise at all constituted evidence that, at the time he made the promise, he did not intend to honor it and he did intend to deceive the promisee-plaintiff.
However, in the more recent case of Holman v. ChildersburgBancorporation, Inc., 852 So.2d 691, 701 (Ala. 2002), this Court held
 "that where, as here, an element of a tort claim turns on the existence of an alleged agreement that cannot, consistent with the Statute of Frauds, be proven to support a breach-of-contract claim, the Statute of Frauds also bars proof of that agreement to support the tort claim. Were the rule otherwise, the Statute of Frauds could be effectively *Page 58 
avoided by the simple wording of the complaint."
The Holman Court explains:
 "As a general rule, '[i]f the proof of a promise or contract, void under the statute of frauds, is essential to maintain the action, there may be no recovery.' Pacurib v. Villacruz, 183 Misc.2d 850, 861, 705 N.Y.S.2d 819, 827 (N.Y. Civ. Ct. 1999) (emphasis added); see also Dwight v. Tobin, 947 F.2d 455, 460 (11th Cir. 1991); McDabco, Inc. v. Chet Adams Co., 548 F. Supp. 456, 458 (D.S.C. 1982) (it is a `well accepted doctrine that one cannot circumvent the Statute of Frauds by bringing an action in tort, when the tort action is based primarily on the unenforceable contract'); Weakly v. East, 900 S.W.2d 755
(Tex.Ct.App. 1995). This is so, because, '[i]f a plaintiff was allowed to recover the benefit of a bargain already barred by the statute of frauds, the statute of frauds would become meaningless.' Sonnichsen v. Baylor University, 47 S.W.3d 122, 127
(Tex.Ct.App. 2001). `Thus, the Statute of Frauds bars a [tort] claim when a plaintiff claims as damages the benefit of the bargain that he would have obtained had the promise been performed.' Id."
852 So.2d at 699.
In 1823, Alabama adopted the English Statute of Frauds, 29 Car. II, ch. 3 (1676), enacted by Parliament and approved by King Charles II, effective June 24, 1677. Toulmin Code 1823, Tit. 18, Ch. III, § 1. Section 1, 29 Car. II, ch. 3 (1676), states the purpose of the Statute of Frauds, in pertinent part: "For prevention of many fraudulent Practices, which are commonly endeavored to be upheld by Perjury and Subordination [sic] of Perjury." Further, "[t]he public policy underlying the statute of frauds is that fraud or perjury will not be rewarded by denying enforcement of alleged contracts that never, in fact, existed. Thestatute exists to protect not just the parties to a contract, but also toprotect the fact finder from charlatans, perjurers and the problems ofproof accompanying oral contracts." 73 Am. Jur.2d Statute of Frauds
§ 425, p. 102 (2001) (footnotes omitted) (emphasis added). See David Co.v. Jim W. Miller Constr., Inc., 444 N.W.2d 836 (Minn. 1989), andMcInerney v. Charter Golf, Inc., 176 Ill.2d 482, 680 N.E.2d 1347 (1997). Moreover, "[t]he purpose of the statute of frauds is to prevent the fraudulent enforcement of unmade contracts, and not to legitimate [sic] the enforcement of contracts that were in fact made." 73 Am. Jur.2d Statute of Frauds § 425, p. 103 (2001) (footnote omitted). SeeTimberlake v. Heflin, 180 W. Va. 644, 379 S.E.2d 149 (1989).
Thus, the Statute of Frauds identifies defined categories of oral promises that are especially subject to fabrication and especially unworthy of reliance or enforcement. Therefore, for the courts, on a theory of promissory fraud, to countenance a plaintiff's claim that he has relied on such a promise and to redress that plaintiff's claim that he has suffered from the breach of such a promise, defies the policy and frustrates the efficacy of the Statute of Frauds.
Therefore, applying the legal reasoning of Holman, supra, this Court now holds that an oral promise that is void by operation of the Statute of Frauds will not support an action against the promisor for promissory fraud. The cases of US Diagnostic v. Shelby Radiology, P.C., 793 So.2d 714
(Ala. 2000), Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359
(Ala. 1993), Hinkle v. Cargill, Inc., 613 So.2d 1216 (Ala. 1992), Deanv. Myers, 466 So.2d 952 (Ala. 1985), and Caron v. Teagle, 408 So.2d 494
(Ala. 1981), are overruled to the extent, but only to the extent, that they conflict with this holding. *Page 59 
Accordingly, Cole's alleged oral put-call promise does not support Bruce's promissory fraud theory against Cole. The trial court did not err in entering a summary judgment against Bruce on his promissory fraud claim.
 IV. Conclusion
In entering a summary judgment in favor of Cole and Medical Holdings and against Bruce on all of the parties' respective claims, the trial court did not err to reversal. The judgment of the trial court is due to be affirmed.
AFFIRMED.
Moore, C.J., and Houston, See, Lyons, Brown, Harwood, and Stuart, JJ., concur.
Woodall, J., dissents.
[1] A "put option" is "[a]n option to sell something (esp. securities) at a fixed price even if the market declines; the right to require another to buy." Black's Law Dictionary 1121 (7th ed. 1999). A "call option" is "[a]n option to buy something (esp. securities) at a fixed price even if the market rises; the right to require another to sell."Id.