[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 13, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-14713

_____

D. C. Docket No. 02-00321-CV-CG-C

COX NUCLEAR PHARMACY, INC.,

Plaintiff-
Counter-Defendant
Appellant,

ACCUSCAN, L.L.C.,

Plaintiff,

versus

CTI, INC.,

Defendant-
Counter-Claimant
Appellee,

P.E.T. NET PHARMACEUTICALS, INC.,

Defendant-Appellee,

RICK HIATT, an individual,

Defendant.

Appeal from the United States District Court
for the Southern District of Alabama
_____

**(February 13, 2007)**

Before BIRCH, PRYOR and FAY, Circuit Judges.

BIRCH, Circuit Judge:

This is a case about a failed transaction for the sale of a cyclotron, a device used to create radioactive pharmaceuticals. Appellant Cox Nuclear Pharmacy, Inc. ("Cox") brought claims against Appellee CTI, Inc. ("CTI") for breach of contract and fraud, and CTI responded with a counterclaim against Cox for breach of contract. Cox appeals the district court's grant of summary judgment in favor of CTI on all of Cox's counts and on CTI's counterclaim, as well as the district court's denial of a motion for relief from judgment under Federal Rule of Civil Procedure 60(b). For the reasons set forth below, we AFFIRM on all grounds.

## I. BACKGROUND

Cox is an Alabama corporation, based in Mobile, that provides radioactive pharmaceuticals to hospitals and clinics in the Mobile area, southern Mississippi, and the panhandle of Florida (the "Market"). CTI is a Tennessee corporation that manufactures cyclotrons for use in positron emission tomography ("PET"), and

2

provides services related thereto. P.E.T.Net Pharmaceuticals, Inc. ("P.E.T.Net") is also a Tennessee corporation, and is a wholly owned subsidiary of CTI. P.E.T.Net produces radioactive pharmaceuticals using CTI cyclotrons.

A PET scan is a medical diagnostic procedure in which radioactive isotopes are introduced into the body, and an imaging device, or "scanner," is used to focus on those isotopes. The substance that is introduced into the body during a PET scan is known as fluorodeoxyglucose ("FDG"). A cyclotron is necessary to produce FDG, which has a half-life of under two hours, and must therefore be consumed quickly after it is produced.

In 2000, Cox began selling FDG in the Market. Because no nuclear pharmacy was operating a cyclotron in the Market at that time, Cox had to fly in doses of FDG from elsewhere, which it purchased from various companies, including P.E.T.Net. At some point in 2000, Cox began to consider acquiring a cyclotron in order to produce FDG without the need to obtain it from outside the Market. Cox contacted CTI to discuss potentially purchasing a cyclotron, and CTI provided Cox with a price quote for a cyclotron, a document projecting potential expenses and revenues associated with operating a cyclotron, and a document comparing the CTI cyclotron with a competing model sold by General Electric Corporation ("GE"). Steven Belcher, a representative of Cox, testified that during

the time Cox was investigating the purchase of a CTI cyclotron, Cox also considered entering into an affiliation agreement with P.E.T.Net, which, among other things, would have given Cox access to new pharmaceutical products developed by P.E.T.Net. Belcher testified that Cox rejected the agreement in early 2001, after being assured by Ned Odeh, a representative of CTI, that Cox would receive all the benefits of the affiliation agreement if Cox purchased a CTI cyclotron.

In November 2001, as Cox continued to consider purchasing a CTI cyclotron, Cox's sole shareholder, William Cox, arranged a meeting at a Cracker Barrel restaurant in Macon, Georgia that included himself, Belcher, other Cox employees, Odeh of CTI, and Steve Putnal, the operator of a CTI cyclotron in Macon. William Cox testified that he arranged the meeting in Macon because he "wanted to see Steve Putnal's operation," "talk to his personnel," and see a CTI cyclotron in use. R2-83, Exh. 2 at 187-88. At the meeting, William Cox indicated that he was ready to purchase a cyclotron from CTI, but he wanted from CTI an agreement or understanding that its subsidiary, P.E.T.Net, would not compete with Cox in the Market. Though he was aware that P.E.T.Net was a wholly owned subsidiary of CTI, he also asked for assurances that his company's purchase of a cyclotron from CTI would be kept secret from P.E.T.Net. Cox testified that, in

4

response to his request for confidentiality, Odeh stated, "'[I]f we're not going to tell [P.E.T.Net] anything about you ordering a cyclotron, they'll never know.' [Odeh] said, 'now, they may find out in the marketplace, but they'll never know.'" Id. at 193. He also testified that Odeh promised CTI would assign Cox's order a "secret number," so that "nobody [would] ever know." Id. at 194.

With respect to Cox's request for exclusivity in the Market, he testified that Odeh indicated that "he couldn't guarantee there [wouldn't] be competition. He could just guarantee that P.E.T.Net wouldn't be in there." Id. at 196. William Cox also asked for a guarantee that P.E.T.Net would not compete with Cox within a certain distance of Cox's cyclotron. He testified:

> I wanted I think a hundred and fifty or two hundred mile radius, and [Odeh] said he didn't think he could get that much, maybe it would be a seventy-five mile radius, but he wasn't sure. That was a very minimum discussion. I just remember trying to get as – I felt like a two-hour drive is what I wanted.

Id. at 197. At the time of this meeting, Cox was aware that P.E.T.Net was planning to install a cyclotron in Covington, Louisiana.

Following the meeting in Macon, on 3 December 2001, Odeh sent a letter to William Cox that stated, in pertinent part:

> I have noted your access to CTI's newly developed chemistry modules and targets; however, I was unable to get a commitment on the seventy-five mile radius you requested. I was told that there are legal ramifications to providing exclusivity.

5

Rest assured that there are no plans, to my knowledge, for PETNet to move into this territory in the future. Please do not hesitate to check the PETNet website for current and future sites.

R2-83, Exh. 16. Cox testified that he received this letter "on or about" 3 December 2001. R2-83, Exh. 3 at 591. The following day, December 4th, William Cox executed a purchase agreement for a CTI cyclotron.

Several days after Cox executed the purchase agreement for a CTI cyclotron, on December 8th or 10th, Belcher received a telephone call from Rick Hiatt, an employee of P.E.T.Net. Belcher testified that Hiatt asked him if it was true that Cox was planning to install a cyclotron in Mobile, and proceeded to warn Belcher "what a mistake it was" for Cox to proceed with those plans, the implication being that Cox would be unable to survive competition from P.E.T.Net. R3-97, Exh. 1 at 202. During the course of the conversation with Hiatt, Belcher confirmed that Cox had purchased a cyclotron from CTI, and planned to install it in Mobile.

Subsequent to Belcher's conversation with Hiatt, Cox learned that P.E.T.Net had been soliciting a Cox customer, the University of Southern Alabama ("USA"), and quoting significantly lower prices per dose of FDG than Cox had quoted. Belcher testified that P.E.T.Net also told USA that Cox was unable to produce certain types of isotopes that P.E.T.Net could produce. Belcher asked Odeh to send a letter to USA on CTI letterhead refuting those statements, but Odeh told

6

Belcher he could not interfere in P.E.T.Net's attempt to win the account. Moreover, P.E.T.Net also offered a lower price per dose to a Cox customer located in Panama City, Florida. Upon learning of this competition from P.E.T.Net, Belcher "was convinced that [Cox] needed to make a change." R3-97, Exh. 8 at 471. William Cox was similarly taken aback, and testified that if he had known he would face competition from P.E.T.Net, "[he] would not have purchased a cyclotron from P.E.T.Net." R3-97, Exh. 10 at 519.

Belcher further testified that around the same time Cox was learning about the competition from P.E.T.Net, CTI informed Cox that there would be a delay with some of the equipment Cox had agreed to purchase. Specifically, CTI told Cox that the "newest, latest, greatest boxes," QuadRx chemistry boxes, would not be immediately available, and offered to provide Cox with the current model, CPCU chemistry boxes, and replace them with the newer models once they became available. R3-97, Exh. 8 at 472. Though Cox "[l]oved the equipment" it had agreed to purchase from CTI, Belcher testified that the combination of unexpected competition from P.E.T.Net, along with the news that the QuadRx chemistry boxes would not be immediately available, "did not feel right." Id. Subsequent to learning about the competition from P.E.T.Net and the delay in the availability of the QuadRx chemistry boxes, Cox informed CTI that it did not intend to go

7

forward with its cyclotron purchase, and entered into an agreement to purchase a cyclotron from GE.

On 3 May 2002, Cox filed a complaint against CTI, P.E.T.Net, and Hiatt, alleging, inter alia, breach of contract and fraud, in connection with a putative agreement between Cox and CTI under which P.E.T.Net would not compete in Cox's geographic territory, and CTI would not disclose to P.E.T.Net that Cox planned to purchase a cyclotron.[1] CTI responded with a counterclaim against Cox for breach of the cyclotron purchase agreement entered into between Cox and CTI. CTI moved for, and the district court granted, summary judgment in CTI's favor as to all of Cox's claims. The district court then ordered the parties to brief the question of whether the summary judgment order also determined Cox's liability on CTI's counterclaim. After receiving the parties' briefs, the court sua sponte granted summary judgment as to liability in favor of CTI on its counterclaim, and ordered a trial as to damages.

After both grants of summary judgment, and before the damages trial, CTI produced certain documents (the "Order File") related to Cox's order of a cyclotron from CTI. The Order File contained some documents that had not previously been produced in the course of discovery. Shortly after receiving the

---

[1]For convenience, we will refer to the defendants collectively as "CTI."

Order File, Cox filed a motion under Federal Rule of Civil Procedure 60(b) requesting relief from both entries of summary judgment, on the grounds that the file constituted new evidence that could not have been discovered earlier, and that CTI's failure to produce the file earlier amounted to fraud or misconduct. The district court denied the motion, finding that the requirements of Rule 60(b) were not satisfied. Cox now appeals from the district court's entry of summary judgment in favor of CTI on Cox's claims, the district court's sua sponte grant of summary judgment on CTI's counterclaim, and the district court's denial of Cox's motion for relief from judgment.

## II. DISCUSSION

A. Summary Judgment on Cox's Claims

"We review de novo the district court's grant of summary judgment . . . , applying the same familiar standards as the district court." Patrick v. Floyd Med. Ctr., 201 F.3d 1313, 1315 (11th Cir. 2000) (citation omitted). "Summary judgment is appropriate if the record shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Gitlitz v. Compagnie Nationale Air France, 129 F.3d 554, 556 (11th cir. 1997) (per curiam) (citation omitted).

1. Contract Claim

Count One of Cox's complaint alleged breach of an oral agreement by CTI and P.E.T.Net not to compete with Cox in the Market. The district court granted summary judgment, finding that the agreement, as alleged by Cox, was void under Alabama's Statute of Frauds. That statute states, in pertinent part:

> In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
>
> (1) Every agreement which, by its terms, is not to be performed within one year from the making thereof;

Ala. Code § 8-9-2(1). The district court further found that, based on the record, no genuine issue of material fact remained as to the alleged agreement's validity. After a thorough review of the record, we agree.

Cox alleged that CTI agreed that, if Cox purchased a cyclotron from CTI, CTI would keep Cox's purchase of a cyclotron secret from its wholly owned subsidiary, P.E.T.Net, and that P.E.T.Net would not compete with Cox in the Market. Cox was unable to produce a written document or memorandum memorializing the alleged contract, but contended that CTI's representative orally entered into the agreement.[2] As the district court observed, Belcher's deposition testimony made clear that the alleged noncompetition agreement was to continue

---

[2] Though Cox's brief refers to "an *undisputed written purchase agreement*," Appellant's Br. at 2, 16 (emphasis in original), that agreement was only for the purchase of the cyclotron, and did not address the issue of the alleged agreement not to compete.

for more than one year. Specifically, the court relied on Belcher's affirmative response when asked whether he "made the assumption or intention that this relationship with a noncompete in this territory would extend well beyond one year," and his statement that he "thought it was a long term deal." R2-83, Exh. 11 at 210. The court also relied on Cox's deposition testimony, in which he stated that "certainly expected eight to ten years" of noncompetition. R2-83, Exh. 2 at 209.

On appeal, Cox does not identify any evidence in the record that creates a genuine issue of material fact for trial. Because the record demonstrates that the agreement was not memorialized in a writing, and was not intended to be performed within a year, the contract is void under Alabama's Statute of Frauds. Accordingly, the district court properly granted summary judgment as to Cox's claim for breach of contract.

2. Fraud Claims

a. Counts Two, Three, Four, Five, and Eight

The district court also granted summary judgment in favor of CTI on Cox's fraud claims. Counts two, three, four, five, and eight of Cox's complaint alleged fraud in connection with the alleged oral contract not to compete. Specifically, Cox alleged that CTI and P.E.T.Net committed fraud in that they promised that

"CTI/P.E.T.Net would not compete with Cox Nuclear and that CTI would not divulge the purchase of the cyclotron by Cox Nuclear to P.E.T.Net," but that "CTI/P.E.T.Net did not intend to keep those promises." R1-1 at 8. The district court held that those fraud claims were based on promises that were part of the alleged oral agreement not to compete, which was invalid under the Statute of Frauds, and therefore the fraud claims failed as a matter of law. We agree.

In Holman v. Childersburg Bancorporation, Inc., 852 So. 2d 691, 701 (Ala. 2002), the Alabama Supreme Court held:

> [W]here, as here, an element of a tort claim turns on the existence of an alleged agreement that cannot, consistent with the Statute of Frauds, be proved to support a breach-of-contract claim, the Statute of Frauds also bars proof of that agreement to support the tort claim.

Though Holman did not address a narrow exception to the above-stated rule for claims of promissory fraud, see id. at 701 n.2, the Alabama Supreme Court eliminated that exception in Bruce v. Cole, 854 So. 2d 47, 58 (Ala. 2003). Bruce applied the holding in Holman to promissory fraud claims, stating, "an oral promise that is void by operation of the Statute of Frauds will not support an action against the promisor for promissory fraud." Id.

The claims set forth in counts two, three, four, five, and eight of Cox's complaint rely on the alleged oral agreement not to compete. As discussed above, the purported agreement not to compete is "an oral promise that is void by

12

operation of the Statute of Frauds," see id., and Cox has identified nothing in the record that creates a genuine issue of material fact as to the validity of that agreement. Because under Alabama law a tort claim may not turn on a promise that is part of a contract voided by the Statute of Frauds, the district court properly granted summary judgment in favor of CTI as to counts two, three, four, five, and eight.

Cox argues that Holman and Bruce do not apply, because the fraud claims in counts two, three, four, five, and eight were not based on promises not to compete in the future, but rather on fraudulent statements that P.E.T.Net had no current plans, at the time the purported agreement was entered into, to compete in the Market. This argument is without support. Cox identifies no evidence of any communications regarding P.E.T.Net's plans that took place contemporaneously with the execution of the purchase agreement. Moreover, the only communication Cox identifies regarding P.E.T.Net's plans that occurred close in time to the execution of the purchase agreement was the 3 December 2001 letter from Odeh to William Cox. For the reasons addressed in more detail subsequently, however, that letter cannot support a fraud claim.

b. Counts Nine, Ten, and Eleven

Counts nine, ten, and eleven of Cox's complaint are based on Odeh's 3

13

December 2001 letter to William Cox, in which he stated, "there are no plans, to my knowledge, for PETNet to move into this territory in the future." R2-83, Exh. 16. Cox contends that this statement amounted to fraud because "at the time of the representations there were in fact plans by CTI and PETNet to market and sell FDG into Cox Nuclear's Market." R2-60 at 2, 3. The district court granted summary judgment in favor of CTI. The court observed that Odeh did not affirmatively represent that P.E.T.Net had no plans to compete with Cox, but rather made only the limited representation that "to [his] knowledge" P.E.T.Net had no such plans. Because Cox did not allege that Odeh had personal knowledge of P.E.T.Net's alleged plans, the court found that counts nine through eleven did not state claims for fraud.

Though Cox conceded at oral argument that Odeh's letter was honest "as far as what [Odeh] knew," Cox argues that P.E.T.Net did have plans to compete in the Market, and that Odeh's lack of personal knowledge is irrelevant. For support, Cox cites several Alabama cases in which an agent made an incorrect representation on behalf of a principal corporation. See Birmingham News Co. v. Horn, 901 So. 2d 27, 60 (Ala. 2004); Bolton Ford of Mobile, Inc. v. Little, 344 So. 2d 1208, 1209-10 (Ala. 1977). Because we agree with the district court that Odeh did not represent that P.E.T.Net had no plans to compete in the Market, but rather

14

stated only that he did not know of any such plans, we find Cox's reliance on these cases misplaced. Yet even if we were to construe Odeh's 3 December 2001 letter as a representation on behalf of CTI that P.E.T.Net had no plans to compete in the Market, rather than a statement of Odeh's personal knowledge, Cox still could not prevail on counts nine through eleven.

Alabama follows a "reasonable reliance" standard as to fraud claims. Thus, to prevail on its claims, Cox "must show not only that [it] relied on [CTI's] alleged misrepresentation . . . , but also that that reliance was *reasonable* in light of the facts surrounding the transaction in question." See Baker v. Metro. Life Ins. Co., 907 So. 2d 419, 421 (Ala. 2005) (emphasis in original). Here, however, the very letter Cox claims to have relied on as a promise that P.E.T.Net had no plans to compete with it explicitly stated that CTI and P.E.T.Net could not promise Cox exclusivity. This, in addition to Odeh's equivocal statement that there were no plans "to [his] knowledge," was sufficient to put a reasonable party on notice that it could not rely on the letter, either as a promise that P.E.T.Net did not presently have plans to compete in the Market, or as a promise that P.E.T.Net would not compete in the Market in the future. Accordingly, any reliance by Cox was not reasonable. See Baker, 907 So. 2d at 421. Because Cox has identified no genuine issue of material fact as to counts nine through eleven, we find that the district

15

court properly granted summary judgment in favor of CTI on these counts.

        c.  Counts Twelve, Thirteen, and Fourteen

The district court granted summary judgment in favor of CTI on counts twelve, thirteen, and fourteen of Cox's Amended Complaint as well. These counts set forth fraud claims relating to the pro forma that CTI provided to Cox. Cox does not address counts twelve through fourteen in its brief, and the issue is therefore waived. See Sammie Bonner Constr. Co. v. W. Star Trucks Sales, Inc., 330 F.3d 1308, 1310, n.2 (11th Cir. 2003). Accordingly, we affirm the district court's grant of summary judgment as to these counts.

B.  Summary Judgment on CTI's Counterclaim

On 9 December 2003, the district court entered an order requesting that the parties submit briefs addressing the following questions:

1.     Is Cox Nuclear's liability on CTI's counterclaim determined by this court's order of December 5, 2003 [granting summary judgment in favor of CTI on all of Cox's remaining claims]? If not;

2.     Is the liquidated damages clause contained in the original Cox Nuclear/CTI cyclotron purchase order . . . void as a matter of law? If not;

3.     Are there unresolved questions of fact relating to the liquidated damages clause and, if so, is a jury trial necessary or may all remaining issues, both legal and factual, be determined at a bench trial before the undersigned and, lastly;

4.     Is it appropriate for this court to grant Cox Nuclear's motion to certify as final its order of December 5, 2003, as to all of plaintiff's claims,

16

but to allow CTI's counterclaim to remain unresolved pending the Eleventh Circuit's consideration of this court's ruling on summary judgment?

R6-190 at 2. The parties' briefs were due 8 January 2004, thirty days from the date of the order. On 29 January 2004, after considering the briefs, the court, <u>sua sponte</u>, entered summary judgment on the counterclaim as to liability, in favor of CTI. Cox contends this grant of summary judgment was in error, arguing that the district court did not afford the parties adequate notice of its intent to rule on CTI's counterclaim.[3] We disagree.

Federal Rule of Civil Procedure 56(c) provides that a motion for summary judgment "shall be served at least 10 days before the time fixed for the hearing," and that, prior to that time, the non-moving party may file opposing affidavits. Rule 56(c)'s notice requirement "is not an unimportant technicality, but a vital procedural safeguard," <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1203-04 (11th Cir. 1999) (quoting <u>Massey v. Congress Life Ins. Co.</u>, 116 F.3d 1414, 1417 (11th Cir. 1997)), and "courts have strictly enforced the requirement that a party threatened by summary judgment must receive notice and an opportunity to respond." <u>Massey</u>, 116 F.3d at 1417. But <u>see</u> <u>Artistic Entm't, Inc. v. City of Warner Robins</u>, 331 F.3d 1196, 1201-02 (11th Cir. 2003) (per curiam) ("[W]here a

_____

[3] On appeal, Cox does not address the merits of the ruling. Thus, we reach only the question of notice.

17

legal issue has been fully developed, and the evidentiary record is complete, summary judgment is entirely appropriate even if no formal notice has been provided."). We have also held that district courts may properly grant summary judgment sua sponte, so long as the parties have been provided adequate notice. See, e.g., Burton, 178 F.3d at 1203 ("A district court possesses the power to enter summary judgment sua sponte provided the losing party 'was on notice that she had to come forward with all of her evidence.'" (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S. Ct. 2548, 2554 (1986))); Massey, 116 F.3d at 1417 (stating that "[d]istrict courts unquestionably possess the power to trigger summary judgment on their own initiative," but must "ensure that the parties receive adequate notice that they must bring forward all of their evidence").

In Artistic Entertainment, we upheld a sua sponte grant of summary judgment where "the district court had no formal motion for summary judgment on the [claims at issue] before it, and did not formally notify [the plaintiff] that it was considering [those claims] in the summary judgment proceedings." 331 F.3d at 1202. At issue in Artistic Entertainment was whether a city ordinance regulating adult entertainment establishments amounted to a prior restraint on speech. The district court requested motions "related to the issue of whether the prior restraint problems with the Adult Ordinance have been cured." Id. at 1200. After receiving

18

the parties' briefs, the district court granted summary judgment in favor of the defendant on all of the plaintiff's claims, including claims as to which the defendant had not moved for summary judgment. Id. at 1200-01. We held that summary judgment was appropriate because "the dismissed claims [had] been fully developed in the evidentiary record and the non-moving party [had] received adequate notice." Id. at 1202. Because "the district court had all the information necessary to rule on the legal issues, and Artistic raised no genuine question of material fact that would have precluded summary judgment," we affirmed. Id.; cf. Massey, 116 F.3d at 1417-18 (overturning grant of summary judgment where the district court provided no notice of its intent "to test the strength of the movant's case under the summary judgment standard").

Here, as in Artistic Entertainment, the district court provided sufficient notice of its intent to address Cox's liability on CTI's counterclaim. Indeed, the court provided the parties thirty days to brief the issue, far more than the ten days required under Rule 56(c). As in Artistic Entertainment, the court's 9 December 2003 order did not use the phrase "summary judgment," but the language of the order plainly conveyed that the court planned to consider whether any issues remained as to Cox's liability on the counterclaim. See Artistic Entm't, 331 F.3d at 1202. Cox has identified no relevant evidence that it was precluded from

19

submitting, and the evidentiary record was extensively developed. For the foregoing reasons, we affirm the district court's grant of summary judgment on CTI's counterclaim.

C. Cox's Rule 60(b) Motion

Cox also appeals from the district court's denial of its motion for relief from judgment under Federal Rule of Civil Procedure 60(b). Cox filed the motion subsequent to the entry of summary judgment on all of Cox's claims, and on CTI's counterclaim as to liability, after CTI produced the Order File. The motion relied on subsections 60(b)(2) (providing for relief based upon "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial") and 60(b)(3) (providing for relief based upon "fraud . . . , misrepresentation, or other misconduct of an adverse party"). The district court found that neither subsection provided a basis for the motion. On appeal, Cox has abandoned its argument that subsection (b)(2) applies, but contends that the district court erred in denying relief under subsection (b)(3).

We review a district court's denial of a motion for relief from judgment under Rule 60(b)(3) for abuse of discretion. Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1287 (11th Cir. 2000). To prevail on a 60(b)(3) motion, the movant must "prove[] by clear and convincing evidence that an adverse party has

20

obtained the verdict through fraud, misrepresentation, or other misconduct." Id. (citations omitted); see also Booker v. Dugger, 825 F.2d 281, 283 (11th Cir. 1987) ("Where relief from a judgment is sought for fraud on the court, the fraud must be established by clear and convincing evidence."). Additionally, "the moving party must [] show that the conduct prevented the losing party from fully and fairly presenting his case or defense." Frederick, 205 F.3d at 1287 (citations omitted). Cox contends that it has met the above standard, and that the district court's denial of 60(b)(3) relief therefore amounted to abuse of discretion. We are unpersuaded.

In support of Cox's argument that it has shown "by clear and convincing evidence" that Rule 60(b)(3)'s standard is met, and that it was prevented from "fully and fairly presenting [its] case or defense," id., Cox states that the Order File "disclosed that CTI knew, when it was trying to convince Cox to purchase the Eclipse cyclotron with Quad-Rx[] chemistry boxes, that these products were defective . . . ." Appellant's Br. at 23. Cox further argues that the Order File "shows that CTI unilaterally changed Cox's purchase order from the Eclipse with Quad-Rx's to the older model RDS111 and CPCU's without notifying Cox or adjusting the contract price accordingly." Id. Though Cox's appellate brief does not identify any specific documents in support of its arguments, Cox's Rule 60(b) motion filed in the district court contained more detail. In that motion, Cox

21

identified order documents that it claimed show CTI never intended to fill the order with an Eclipse cyclotron and QuadRx chemistry box, but rather planned to install the older equipment. The motion also discussed an e-mail from CTI to Cox that Cox claimed demonstrates that Cox still fully expected the new version of the cyclotron even after CTI was aware it could not deliver the new version on schedule.

1. E-mail From CTI to Cox

The e-mail contained in the Order File that Cox argues entitles it to 60(b)(3) relief is a 15 April 2002 e-mail from Odeh of CTI to Belcher of Cox. The e-mail stated:

> to follow up on our conversation, if the evaluation of the Quad[R]x by Chris Paulus and Bob Galloway is not satisfactory to you, we will credit you for the Quadrx and facilitate the purchase of the NI or Coincidence box[e]s.

R8-261, Exh. A at CTI OF 0029. In Cox's Rule 60(b) motion, it argued that this email proves that, as of 15 April 2002, it was unaware of any potential problems with the QuadRx chemistry boxes. Yet this e-mail cannot be the basis for relief under Rule 60(b)(3) for the obvious reason that, as a party to the communication, Cox has been in possession of this e-mail from the time it was sent, and does not claim otherwise. Once this message was sent, CTI could not have fraudulently withheld it from Cox even if CTI had been so inclined. What is more, Cox does

22

not dispute that CTI produced this document twice in the course of discovery well before the Order File was produced.

We also find Cox's reliance on the above e-mail to be unpersuasive at best, and disingenuous at worst, when viewed in light of an e-mail sent earlier the same day from Odeh to Belcher. In that e-mail, Odeh stated:

> Steve, as you know we are redesigning certain components of the QuadRx and I was told that the QuadRx with the new design will not be available until later this year. My recommendation is for shipping your cyclotron with the CPCU and swap the CPCU with the QuadRx when the new revision is available.

Id. at CTI OF 0030. This e-mail, which Cox possessed throughout the course of this litigation, appears to refute Cox's repeated assertions that CTI sought to conceal potential delays in the availability of the products Cox purchased from CTI. Compare Appellant's Br. at 11 ("CTI never told Cox anything to the effect that CTI was redesigning certain components of the QuadRx.") with R8-261, Exh. A at CTI OF 0030 ("Steve, as you know we are redesigning certain components of the QuadRx . . . .").

2. Other Documents Contained in Order File

Cox's 60(b)(3) motion also identified several other documents that Cox argued prove CTI planned to deliver older CPCU chemistry boxes without informing Cox of the change, while continuing to charge Cox for the newer

23

QuadRx models. Having reviewed the documents at issue, we are not persuaded that they show CTI never intended to deliver the promised products. Indeed, taken together with the 15 April 2002 e-mail from Odeh to Belcher, in which CTI candidly informed Cox that there were problems with the QuadRx and suggested temporarily substituting the CPCU, it is clear that CTI did not seek to surreptitiously install one model of cyclotron while leading Cox to believe it was receiving another. The documents contained in the Order File thus militate *against* a finding that CTI sought to defraud Cox, and as such, it is unclear how the lack of some of those documents prevented Cox from "fully and fairly presenting [its] case or defense" as to its fraud claims. See Frederick, 205 F.3d at 1287.

Furthermore, even if the documents contained in the Order File did show that CTI possessed the intent to breach its contract with Cox, it is unclear how the documents could have affected the outcome of the litigation. Cox informed CTI in May 2002 that it did not intend to perform under the purchase agreement. Yet Cox does not contend that CTI first anticipatorily repudiated the purchase agreement, thereby justifying Cox's refusal to perform.[4] See Shirley v. Lin, 548 So. 2d 1329,

_____

[4] Though Cox's brief offers only a vague description of the circumstances surrounding its decision to "cancel[] the CTI order," Appellant's Br. at 12, its opposition to CTI's motion for summary judgment offered more details. That document explained that Cox's decision to breach the purchase agreement was due in large part to its belief that P.E.T.Net had "breached" the putative agreement not to compete and confidentiality agreement. R3-109 at 8. See also R3-97, Exh. 10 at 519 (deposition testimony of William Cox) (stating that if he had known Cox would face competition in the Market from P.E.T.Net, "[he] would not have purchased a cyclotron from P.E.T.Net.").

1334 (Ala. 1989) ("Once a party to a contract repudiates the agreement, the other party is excused from further performance."). Accordingly, even if CTI was not planning to fulfill its contractual obligations, that fact would not have changed the outcome of the litigation, because Cox breached before CTI had the opportunity to do so. We do not believe that lack of certain documents contained in the Order File hampered Cox's presentation of its case, nor are we persuaded that possession of the documents "would have been a catalyst for a different approach to this case," as Cox argues. Appellant's Br. at 25. We therefore find that the district court did not abuse its discretion in denying Cox's Rule 60(b) motion.

## III. CONCLUSION

Cox appealed the district court's entry of summary judgment in favor of CTI on all counts of Cox's complaint and on CTI's counterclaim. Cox also appealed the denial of its motion for relief from judgment. Because we find no genuine issue of material fact as to either Cox's claims or CTI's counterclaim, and because the requirements of Rule 60(b)(3) are not satisfied, we **AFFIRM** on all grounds.