[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 4, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-10759

_____

D. C. Docket No. 95-08546-CV-ASG

KMS RESTAURANT CORP.,
a Florida corporation,
FREDERICK J. KEITEL, III,

Plaintiffs-Appellants,

versus

WENDY'S INTERNATIONAL, INC.,
an Ohio corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 4, 2004)**

Before EDMONDSON, Chief Judge, CARNES, Circuit Judge, and MILLS[*],

_____

[*] Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

District Judge.

CARNES, Circuit Judge:

More than a decade ago KMS Restaurant Corporation began attempting to purchase 27 Wendy's Old Fashioned Hamburger restaurants in Florida from Citicorp, North America, Inc. Because the restaurants are franchises of Wendy's International, Inc., the purchase contract was contingent on Wendy's approval of KMS as a franchisee. Ultimately Wendy's did not approve KMS, the contract with Citicorp failed and, in keeping with the spirit of the times, litigation followed. This appeal involves KMS' claim that Wendy's tortiously interfered with KMS' contract with Citicorp, which is a part of one of the many lawsuits that resulted.

The essential procedural fact for present purposes is that the district court, in granting summary judgment against KMS on its claim of tortious interference, rejected KMS' theory that Wendy's could be liable because it used improper methods even though its motive was not solely malicious. The district court's ruling was based on a misunderstanding of a statement about Florida law on tortious interference contained in a recent decision of this Court. Because we believe that KMS' theory is viable under Florida law, we will remand to the district court for further proceedings. Before we do that, however, we need to deal with the issue of whether KMS' primary shareholder, Rick Keitel, has standing to

2

continue in this litigation in his personal capacity. We agree with the district court that he does not.

## I.

A number of related lawsuits were brought as a result of the events we have just described. The particular lawsuit with which we are concerned was initiated in July 1995, when KMS and Keitel filed suit in a Florida state court against Wendy's and Citicorp. The complaint contained three counts. Count I alleged that Wendy's tortiously interfered with Keitel and KMS' contract to buy Citicorp's 27 restaurants. Count II alleged that Wendy's tortiously interfered with the advantageous business relationship that existed between Keitel and his business partners, Martin J. Abel and Melvin B. Seiden, with whom Keitel had incorporated KMS. Count III alleged that Citicorp breached its duty to act in good faith when it refused to sell the restaurants to Keitel and KMS after Wendy's declined to approve them as franchisees.

The case was removed to federal court based on diversity jurisdiction. Citicorp eventually settled; Count III was dismissed; Citicorp was dropped from the lawsuit. The district court granted summary judgment to Wendy's as to the other two Counts in July 1998. KMS and Keitel appealed.

In February 2000, a panel of this Court issued an unpublished opinion.

KMS Rest. Corp. v. Wendy's Int'l, Inc., (KMS I), No. 98-5336 (11th Cir. Feb. 2, 2000). As to Count I, in KMS I this Court held that the district court had relied too heavily on a single case in interpreting Florida law. We concluded "that a franchisor's privilege [to interfere] is limited and qualified" and remanded for reconsideration in light of several decisions of the Florida courts.

As to Count II, in KMS I we agreed with the district court that Keitel and KMS were essentially seeking compensation on the ground that Wendy's actions had made it more expensive for them to do business with Abel and Seiden. We concluded, as had the district court, that Keitel and KMS were seeking relief under §776A of the Restatement (Second) of Torts and that, because the Florida courts have not adopted § 766A, their claim failed.

On remand, Wendy's again moved for summary judgment as to Count I, the tortious interference claim. It did so based on this Court's then newly-issued published opinion in Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285 (11th Cir. 2001). Interpreting the Ford decision to mean that Wendy's "privilege to interfere is qualified only where malice is the sole basis for interference," the district court again granted summary judgment to Wendy's. It reasoned that Wendy's "sole basis for interference" was not malicious since Wendy's had legitimate business reasons for acting. The district court also suggested, but did

4

not decide, that an affidavit of Keitel relating to the tortious interference claim was probably inadmissible. It simultaneously ruled that because of the demise of Count II Keitel lacked standing to continue the lawsuit in his personal capacity. Keitel and KMS appealed. This is that appeal.

## II.

We review de novo the district court's conclusion that Keitel does not have standing to litigate the only claim remaining in this case. London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1251 (11th Cir. 2003). The original complaint named both Keitel and KMS as plaintiffs, and both Wendy's and Citicorp as defendants. As we have mentioned, the claim against Citicorp has been settled. The claim that Wendy's interfered with an advantageous business relationship between Keitel and his business partners has been resolved through a grant of summary judgment in favor of Wendy's, which was affirmed during a prior appeal. KMS I, No. 98-5336 at 12-13. That leaves only the tortious interference claim under review in this appeal.

The following facts are necessary to understand why we resolve the issue of Keitel's standing against him. On November 21, 1991, Keitel wrote a letter to Citicorp which expressed his intent "on behalf of a venture to-be-formed with Omni Capital Group, Ltd., and/or its principal(s)" to buy the 27 restaurants from

Citicorp. Six days later he wrote a second letter which amended the first.[1] These two letters are collectively referred to as the "letter of intent." Next, Keitel formed KMS with a principal of Omni Group and with Abel and Seiden. KMS then signed an Asset Purchase and Sale Agreement with Citicorp. That agreement is the contract with which Wendy's allegedly tortiously interfered. It is undisputed that Keitel is not personally a party to the agreement.

Keitel argues that he has standing because of rights granted to him in the letter of intent and admits that his argument is contingent on the letter of intent not being superseded by the subsequent agreement. We doubt that the letter of intent created any rights at all, but to the extent that it did those rights were created for KMS, i.e., the "venture to-be-formed," not for Keitel individually. In the first two paragraphs of the November 21 letter the parties to the agreement are identified as Citicorp and the venture to-be-formed. Likewise, the agreement itself states that the parties to it are Citicorp and KMS, who it tells us "are parties to that certain letter of intent as dated as of November 21, 1991, as amended by letter dated as of November 27, 1991." The agreement also includes a clause that supersedes "any and all prior agreements and understandings relating to the subject matter of this

---

[1] The parties do not cite to the second letter and we have been unable to find it in the record. We treat the letter as irrelevant on the assumption that the parties (or at least the one it favored) would have provided the letter to us if it were relevant.

agreement," including the letter of intent. And it was Keitel, not someone unaware of the letter of intent, who signed the agreement on behalf of KMS in his capacity as its chairman.

Any rights created by the letter of intent belonged to KMS, and it exercised them when Keitel, as its chairman, signed the agreement which superseded the letter of intent. Keitel's position that he obtained individual rights which he retains to this day cannot survive even a cursory reading of the letter of intent and the agreement. Because Keitel has no rights of his own under the letter of intent or the agreement, he lacks standing to pursue on his own behalf the tortious interference claim. Cf. Superior Ins. Co. v. Libert, 776 So. 2d 360, 365 (Fla. 5th DCA 2001) ("If a party assigns his rights, he has no standing to file suit."). And, of course, Keitel in his individual capacity cannot pursue a claim on behalf of KMS. See Stevens v. Lowder, 643 F.2d 1078, 1080 (5th Cir. Unit B. Apr. 1981)[2] ("An action to redress injuries to a corporation cannot be maintained by a shareholder in his own name but must be brought in the name of the corporation. The shareholder's rights are merely derivative and can be asserted only through the corporation."). KMS is the proper plaintiff for this claim. Keitel is not. He

---

[2] Decisions by Unit B of the former Fifth Circuit are binding on this Court. Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982).

7

lacks standing to assert it.

## III.

We turn now to KMS' allegation that Wendy's tortiously interfered with KMS' contract with Citicorp to buy the 27 restaurants. Basically, KMS alleges that Wendy's tortiously interfered by taking certain steps to destabilize KMS' corporate structure and then used that lack of stability as grounds for denying KMS franchisee approval, thereby enabling Wendy's to buy the restaurants itself. The basis of the district court's latest rejection of KMS' claim is its interpretation of our decision in Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285 (11th Cir. 2001), which involved Florida law.

This is a diversity case in which the parties agree that Florida's substantive law governs. That means we must decide the case the way it appears the Florida Supreme Court would decide it. In the absence of any Florida Supreme Court decisions close enough on point, we look to decisions of the Florida intermediate appellate courts and follow them unless there is some really persuasive indication that the Florida Supreme Court would go the other way. McMahan v. Toto, 311 F.3d 1077, 1080 (11th Cir. 2002); Ford, 260 F.3d at 1290.

To establish its claim of tortious interference, KMS must prove the following: (1) the existence of a business relationship between KMS and Citicorp;

8

(2) Wendy's knowledge of the business relationship between KMS and Citicorp; (3) Wendy's intentional and unjustified interference with KMS' relationship with Citicorp which caused Citicorp's refusal to go through with the sale of the restaurants; and, (4) damage to KMS because of Citicorp's refusal. See Seminole Tribe v. Times Pub. Co., 780 So. 2d 310, 315 (Fla. 4th DCA 2001). The first two elements are not in dispute. The third element is the one on which the district court focused, concluding that Wendy's alleged interference was justified or privileged. As an alternative basis for affirmance, Wendy's also disputes whether causation exists, but that is a factual argument to be addressed initially by the district court on remand.

As to the justification or privilege element, when the district court first granted summary judgment for Wendy's in July 1998 it reasoned that Wendy's could not be held liable for tortious interference because as the source of the business opportunity it was privileged to interfere. In reaching that conclusion, the district court relied on Genet Co. v. Annheuser-Busch, Inc., 498 So. 2d 683 (Fla. 3d DCA 1986), a case in which a franchisor, motivated entirely by business considerations, failed to approve a franchisee's proposed transfer, and was held to have acted within the scope of its privilege. Id. at 685.

In KMS' first appeal, we surveyed the relevant Florida case law and said:

9

"[W]e are of the opinion that a franchisor's privilege is limited and qualified. Whether the franchisor has gone beyond its limited and qualified privilege is generally a question for the trier of fact." KMS I, No. 98-5336, at 7-12. We remanded for further proceedings. Id. at 12, 14.

While the case was pending before the district court on remand, this Court published its opinion in Ford. In that case, the franchisee plaintiff alleged that Ford Motor Company had tortiously interfered with the plaintiff's contract to sell its Ford dealership to CarMax by refusing to approve the proposed new location and transfer of ownership. Ford, 260 F.3d at 1288-90. The plaintiff questioned Ford's motives and offered evidence about how Ford had acted arbitrarily and failed to follow its standard operating procedures when it decided to disapprove the deal. Id. at 1289. There were no allegations that Ford had used improper methods.

This Court in Ford gave only summary treatment to the tortious interference claim, which was one of several claims in the case. We reasoned that the case was identical to Genet in all material respects, making summary judgment for Ford proper. Id. at 1294. The plaintiff had contended that "a party's privilege to interfere, pursuant to Genet, is qualified and does not apply where a party purposefully interferes or acts egregiously." Id. at 1294 n.9. In a footnote, we

10

rejected that contention, saying that "[t]he privilege is qualified only where malice is the <u>sole</u> basis for the interference. In other words, the party must be interfering <u>solely</u> out of spite, to do harm, or for some other bad motive." <u>Id.</u> (internal citation omitted).

Based primarily on our <u>Ford</u> decision, the district court on remand in this case granted summary judgment to Wendy's on the grounds that Wendy's had not acted solely out of malice.[3] The district court believed that <u>Ford</u> had interpreted Florida law to be that a franchisor's privilege to interfere would be lost only when the franchisor acted solely out of malice, that any methods could be used if the motive were not purely malicious.

We disagree with the district court's analysis of the <u>Ford</u> decision. In that case, the plaintiff "presented a plethora of evidence about [Ford's] motive," <u>Ford</u>, 260 F.3d at 1289, but alleged nothing at all about improper methods. This Court in <u>Ford</u> rejected the plaintiff's arguments because it could not prove that Ford's motive was entirely malicious, that is, the plaintiff could not rule out Ford having a permissible motive. <u>Id.</u> at 1294 & n.9. The <u>Ford</u> decision says nothing about

---

[3] The district court understood that the law of the case doctrine required it to follow the express or implied holdings of <u>KMS I</u>. However, it determined that an exception to that rule applied, because an appellate court's earlier decision in a case need not be followed when "controlling authority has since made a contrary decision of law applicable to that issue." <u>A.A. Profiles, Inc. v. City of Fort Lauderdale</u>, 253 F.3d 576, 582 (11th Cir. 2001). It saw <u>Ford</u> as such controlling authority.

11

whether the privilege might be lost for reasons that do not involve motive, and it could say nothing on that subject which would be binding because judicial decisions can reach only as far as the facts that give rise to them. Watts v. BellSouth Telecomm., Inc., 316 F.3d 1203, 1207 (11th Cir. 2003) ("[J]udicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); see also United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) ("'The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision.'") (quoting United States v. Hunter, 172 F.3d 1307, 1309 (11th Cir. 1999) (Carnes, J., concurring)). Ford simply concluded that in order to succeed on a tortious interference claim under Florida law using an improper motive theory, the plaintiff must prove that the defendant's motive was purely malicious. Ford, 260 F.3d at 1294 & n.9. That conclusion is supported by Florida decisions. Ethyl Corp. v. Balter, 386 So. 2d 1220, 1225-26 (Fla. 3d DCA 1980); McCurdy v. Collis, 508 So. 2d 380, 383 (Fla. 1st DCA 1987) (citing Ethyl).

However, Florida decisions also support KMS' contention that even where the defendant's motive is not purely malicious, a tortious interference claim may succeed if improper methods were used. Ethyl, 386 So. 2d at 1225-26 ("[S]o long as improper means are not employed, activities taken to safeguard or promote

12

one's own financial, and contractual interests are entirely non-actionable.") (footnote omitted); <u>Morsani v. Major League Baseball</u>, 663 So. 2d 653, 657 (Fla. 2d DCA 1995) (distinguishing <u>Genet</u> because the present case "alleged the use of threats, intimidation and conspiratorial conduct"); <u>McCurdy</u>, 508 So. 2d at 383-84 ("In those circumstances in which there is a qualified privilege to interfere with a business relationship, the privilege carries with it the obligation to employ means that are not improper. In other words, the privilege does not encompass the purposeful causing of a breach of contract." (internal citation omitted)); <u>Making Ends Meet, Inc. v. Cusick</u>, 719 So. 2d 926, 928 (Fla. 3d DCA 1998) (Where a lease granted a landlord veto rights on the tenant's sale of the lease, the court quoted the language from <u>McCurdy</u>, reproduced immediately above, and found that the landlord's "actions were sufficiently egregious to overcome the immunity afforded" to him.); <u>Monco Enters., Inc. v. Ziebart Corp.</u>, 673 So. 2d 491, 491-92 (Fla. 1st DCA 1996) (finding that the franchisee stated a cause of action where a franchisor interfered with the franchisee's ability to sell his franchise by luring a potential buyer to purchase a different franchise, and attempting to do the same with another potential buyer); <u>see also</u> Florida Standard Jury Instruction (Civil) MI 7.2 (stating that one who uses physical violence, misrepresentations, illegal conduct, threats of illegal conduct, or other improper conduct, "has no privilege to

13

use those methods, and his interference using such methods is improper" (footnote omitted)).

We have previously reached this same conclusion in another case where we were called upon to apply Florida law. G.M. Brod & Co. v. U.S. Home Corp., 759 F.2d 1526 (11th Cir. 1985). There we said:

> Nor need we tarry long to dispose of Home's contention that, under Ethyl Corp. v. Balter, 386 So. 2d 1220 (Fla. 3d DCA 1980) petition denied, 392 So. 2d 1371 (Fla. 1981), cert. denied, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981), since there was no proof that Home acted solely out of malice, there can be no claim for tortious interference. Ethyl stands for no such proposition. The Ethyl court inferred (although it was not called upon to decide the issue) that if the acts complained of were "solely the conception and birth of malicious motives" the interference would be actionable. Id. at 1225. This is certainly not to say the converse is true, i.e., that there can be no claim for tortious interference without proof that the defendant acted solely out of malice. The significant inquiry to determine the privilege of justification is whether the means employed are not improper.

Id. at 1535. Wendy's arguments to the contrary are foreclosed by the cited decisions of the Florida courts and this Court.[4]

## IV.

---

[4] In its reply brief and at oral argument, KMS pressed for the first time in this Court the alternative argument that whether Wendy's acted solely out of malice should be decided by a jury. Because that argument was not made in KMS' original brief, it is waived. Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen, 815 F.2d 1435, 1446 n.16 (11th Cir. 1987) ("[A] party cannot argue an issue in its reply brief that was not preserved in its initial brief."). We consider it established for present and future purposes that Wendy's did not act solely out of malice.

In conclusion, we agree with the district court that Keitel does not have standing to pursue the tortious interference claim. However, we remand for further proceedings on KMS' claim that Wendy's tortiously interfered with its contract with Citicorp by using improper methods. Those further proceedings should take as given that use of improper methods may support a tortious interference claim even when the defendant did not act solely out of malice.[5]

AFFIRMED IN PART; VACATED AND REMANDED FOR FURTHER PROCEEDINGS IN PART.

---

[5] We do not reach the issue about whether the affidavit of Rick Keitel, which relates to the methods Wendy's used, is admissible. The district court found that its resolution of the case did not require deciding that issue, though it shared its inclination to rule the affidavit inadmissible. While our resolution of this case means that the issue must now be addressed, we will not decide it before the district court does. It remains a live issue on remand.

15