[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 09-15377 & 09-16424

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 11, 2011
JOHN LEY
CLERK

D. C. Docket No. 08-00568-CV-T-27-TBM

KIRTSEN KISSINGER-CAMPBELL,

Plaintiff-Appellee,

versus

C. RANDALL HARRELL, M.D., P.A.,
C. RANDALL HARRELL, M.D.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(February 11, 2011)

Before DUBINA, Chief Judge, and ANDERSON, Circuit Judge.*

_____

  *  Although United States District Judge David H. Coar of the Northern District of Illinois sat by designation in this case, he retired as an Article III Judge in December 2010. Accordingly, we decide this case by a quorum. *See* 11th Cir. R. 34-2.

PER CURIAM:

C. Randall Harrell, M.D., P.A. ("The Fountain of Youth") and C. Randall Harrell, M.D., appeal from two district court orders denying their renewed motion for judgment as a matter of law and their request for a new trial, following a jury verdict for Plaintiff, Kirtsen Kisssinger-Campbell on a claim of tortious interference. Because we conclude that the district court did not err in dismissing these motions, we affirm.

Defendants raise a bevy of claims in their appeal. They begin by arguing that the district court erred in not granting them judgment as a matter of law because there was no evidentiary basis for the verdict at trial. Next, they request a new trial on the ground that prejudicial hearsay was wrongly admitted. Defendants then contend that the jury's award for emotional distress should be struck because the alleged damages lacked a causal connection with Plaintiff's claim and because it is inconsistent with the damages award for the general tort claim for intentional interference. Finally, Defendants claim that their Rule 60(b)(2) and Rule 60(b)(3) motions should have been granted because newly discovered evidence demonstrates that the judgment at trial was likely inaccurate and that Plaintiff committed a fraud on the court, which denied Defendants an opportunity to

conduct a full and fair trial. For the following reasons, we believe that these claims lack merit.

## I. FACTS

Defendant, C. Randall Harrell, M.D., is a registered cosmetic surgeon in the Palm Harbor, Florida area and directs his own practice, The Fountain of Youth Institute. The doctor and his practice are both defendants in this suit. Plaintiff, Kirtsten Kissinger-Campbell went to work for Defendant as an image consultant and assistant office manager sometime in September or October of 2005. As an image consultant, Kissinger-Campbell's primary responsibility was in sales. She would meet with prospective clients and discuss with them their options as to services performed by Harrell. Kissinger-Campbell's compensation consisted of a base salary and a monthly bonus. During her tenure at the Fountain of Youth, Kissinger-Campbell also accumulated some managerial responsibilities in the office. At the beginning of 2007, Harrell did not award Kissinger-Campbell her monthly sales bonuses for the months of January or February after announcing that the bonus formula would be changed for both her and her supervisor, Scott McCauley. McCauley's bonus ultimately increased while Kissinger-Campbell's decreased.

3

Prior to Plaintiff's beginning employment with Harrell, Defendants formed a business relationship with My Choice Medical, Inc., ("My Choice") a referral source and financing agent for cosmetic surgery patients. At some point in 2004 or 2005, Harrell and My Choice entered into a business relationship whereby My Choice referred clients to Harell. This relationship appears to have been set forth in writing in a contract between My Choice and Penn Plastic Surgery of Pennsylvania, a company somehow associated with The Fountain of Youth. My Choice had its own image consultants, so Kissinger-Campbell had no role in bringing in customers who were referred by the company. By the beginning of 2007, referrals from My Choice were becoming an increasingly large portion of Harrell's clientele, making Kissinger-Campell's position less important.

In March 2007, Harrell informed Kissinger-Campbell that she was being removed from her sales position and placed in the role of receptionist.[1] Because Kissinger-Campbell did not approve of her new position and because she did not believe that Defendants would pay her accrued bonuses, she decided to tender her letter of resignation on March 27, 2007. Kissinger-Campbell claims that she agreed

---

[1] Plaintiff eventually sued Harrell on a breach of contract theory in Florida state court because of this change in employment responsibilities. This suit is ongoing and Defendants have attempted to use evidence gathered as part of its discovery in that case to assert their claims for fraud on the court in this case, as discussed below.

Plaintiff also filed suit against Defendants for unpaid overtime. That suit was commenced in May 2007, the first of the three lawsuits Plaintiff filed against Defendant.

to stay on for another month to train a replacement sales person, but due to harsh treatment by Harrell, she abruptly decided to quit on April 2. Shortly thereafter, Kissinger-Campbell received a letter from Harrell that threatened suit against her. The letter asserted that her wages might be garnished due to libelous allegations that she had made about the practice.

During the early months of 2007, Kissinger-Campbell exchanged several emails with Leanne Green, an image consultant for My Choice, who served the portion of the clientele that was referred to Harrell from 2005 to 2007. Plaintiff contacted Green after her demotion, but before she left Harrell's office, and asked her whether she knew of any openings in the field and if she enjoyed her job at My Choice. Green suggested that Kissinger-Campbell possibly come to work at My Choice.

Harell claims that this communication was an attempt on the part of Green to recruit Kissinger-Campbell away from Fountain of Youth and a potential violation of the contract between My Choice and Penn Plastic Surgery. He believed that this contract applied to his practice and that a confidentiality clause in the agreement prevented the recruiting of current employees from one company to the other. Kissinger-Campbell's account is that the conversation was just a casual discussion

that she initiated because she was unhappy with her job and exploring her employment options.

After her resignation, Kissinger-Campbell learned that My Choice was interested in hiring a new employee to cover the Florida area, and she applied for the position. Harrell learned of the email correspondence between Kissinger-Campbell and Green on April 16, 2007. He immediately contacted Vince Traposso, an officer at My Choice, and informed him of his belief that My Choice was in violation of the agreement. According to the Defendants, the contract has very broad language concerning the use of proprietary information. Plaintiff claims that the contract in question had no bearing on whether My Choice could hire her and that it could not be mistaken as having such a provision. Defendants argue that the contract's broad confidentiality clause would at least preclude My Choice from hiring away any of the current employees of the Fountain of Youth. Harrell testified that he spoke to Trapasso about the contract because he was concerned that Green may have violated the contract and he wanted to ensure that such actions were avoided in the future. My Choice did not hire Plaintiff in April 2007, though it eventually hired her in August of that year. When My Choice did hire plaintiff, it was for another position covering Nashville and New Orleans, rather than Florida.

Trapasso was the ultimate decision-maker on My Choice's human resources decisions and was responsible for the original decision not to hire Kissinger-Campbell. Donielle DiTota served under Trapasso and relayed his decision to Plaintiff. She testified that it was her understanding that Kissinger-Campbell was not hired in April 2007 because of the phone conversation between Harrell and Trapasso.

Kissinger also interviewed with Medi-Weight Loss ("Medi-Weight") in St. Petersburg, Florida. Plaintiff testified that the interview took place about "the third week of May" and that she believed that she had at least one other interview with Dr. Zbella, the owner of the franchise, possibly by phone. After the interview, Kissinger-Campbell discontinued her job search. However, she did not get a job with Medi-Weight and resumed searching for employment in mid-June 2007.

Eva Gamaras, formerly a close friend of Kissinger-Cambell's and a surgical technician employed by Harrell, testified that she had a conversation with Harrell around January of 2008 in which he said that he had ensured that Kissinger-Campbell would not get the job at Medi-Weight. Harrell also asked Gamaras to relay a message from him and his wife that they wanted to meet with Kissinger-Campbell to discuss a resolution to the lawsuit. Plaintiff declined the opportunity to meet with Harrell, telling Gamaras that she feared Harrell because he was

threatening to counter-sue for $250,000. Harrell was, allegedly, furious that Kissinger-Campbell had refused this invitation.

In May 2007, Kissinger-Campbell filed suit for non-payment of overtime, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. On February 29, 2008, Plaintiff filed the complaint in the instant case in Florida state court. The complaint alleged that Defendants retaliated against her for the filing of the earlier lawsuit by interfering with her attempts to obtain a new job in the medical field. She brought claims for retaliation in violation of the FLSA and the Florida Whistle-blower's Act, as well as a claim for tortious interference. Defendants successfully removed the case to the United States District Court for the Middle District of Florida shortly thereafter. The District Court found that it had jurisdiction on the basis of the FLSA claim.

On June 5, 2009, the jury returned a verdict which found for the Plaintiff on the ground of tortious interference but found for the Defendants on the retaliation claims, under both the FLSA and the Florida Whistle-blower's Act. Defendants filed several motions for judgment as a matter of law or, alternatively, for a new trial. Included in the final motion was evidence gathered from depositions of Dr. Zbella and his office manager at Medi-Weight, Sharon DeLuca, which were taken

in a subsequent case in Florida state court. The district court denied Defendants'

motions.

## II. DISCUSSION

A. Defendants' claim that the evidence presented was insufficient to support the

jury's verdict on the claim of tortious interference or, in the alternative, that

Harrell's actions were privileged

Defendants assert that no reasonable jury could have concluded that they

tortiously interfered with Kissinger-Campbell's attempts to obtain employment

with My Choice or Medi-Weight. However, the district court laid out a substantial

set of facts presented with respect to each job, on the basis of which the jury could

have concluded that Kissinger-Campbell established a business relationship with

each employer that Defendants tortiously interfered with.

Under Florida law, the elements of a claim for tortious interference are: "(1)

the existence of a business relationship, not necessarily evidenced by an

enforceable contract; (2) knowledge of the relationship on the part of the

defendant; (3) an intentional and unjustified interference with the relationship by

the defendant; and (4) damage to the plaintiff as a result of the breach of the

relationship." Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126, 1127 (Fla.

1985); KMS Restaurant Corp. v. Wendy's Int'l, Inc., 361 F.3d 1321, 1325 (11th Cir.

9

2004). Defendants' sufficiency of the evidence challenges focus on the first element. With respect to that first element, "A protected business relationship need not be evidenced by an enforceable contract. However, 'the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights.' " Gossard v. Adia Services, Inc., 723 So.2d 182, 184 (Fla. 1998) (quoting Register v. Pierce, 530 So.2d 990, 993 (Fla. App. 1st Dist. 1988)). "The test is whether there was 'an understanding between the parties [which] would have been completed had the defendant not interfered.' " St. John's River Mgmt. v. Fernberg Geological, 784 So.2d 500, 505 (Fla. App. 5 th 2001) (quoting Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So.2d 812, 814 (Fla. 1994)).

As to the My Choice job, the district court made the following findings:

(1) During her employment with Defendants, Plaintiff was a point of contact between Defendants and My Choice and worked closely with representatives of My Choice; (2) in April, 2007, shortly after Plaintiff left Defendants' employment, Leeann Green (a representative of My Choice in Florida who resigned around the time that Plaintiff began her search for a new job) recommended Plaintiff to Donielle DiTota (My Choice's office manager) for a position as a My Choice representative; (3) Plaintiff called DiTota to express her interest in employment as a My Choice representative in Florida and submitted a resume, which "kind of got things moving"; (4) DiTota, who described this period as one "when we were trying to hire [Plaintiff]," passed on Plaintiff's resume to My Choice's human resources department or to her boss Vince Taposso, who was a part-owner (and perhaps also head of the human resources department) of My Choice and was responsible for the hiring decisions; (5) in a telephone conversation initiated by Harrell (the existence of

10

which was corroborated to some extent by Harrell's testimony (and the testimony of Scott McAuley, Defendants' office administrator), Harrell "made it very clear, that employing [Plaintiff] would be breach of contract"; (6) My Choice declined to hire Plaintiff; (7) Harrell admitted to Eva Gamaras, a "surgical technologist" at his clinic, that he prevented Plaintiff from obtaining employment at My Choice and Medi Weight Loss; (8) Plaintiff received no response to her application until a few months later when DiTota explained to Plaintiff that My Choice's contractual obligations to Defendants prevented My Choice from hiring Plaintiff; (9) a few months later, DiTota again recommended Plaintiff for a position as a My Choice representative; and (10) in part as a result of a change in ownership at My Choice, My Choice then hired Plaintiff as a My Choice representative.

Doc. 8 at 6–8.

The court's findings demonstrate that considerable circumstantial evidence was presented to the jury upon which to base its judgment. Harrell points out that Trapasso, the ultimate decision-maker in the determination not to hire Kissinger-Campbell originally, was not called to testify. However, his testimony was not necessary for there to be sufficient evidence for a finding of tortious interference, as demonstrated by the findings of the district court.

Defendants' contention that Harrell was privileged to act, with respect to the My Choice claim, bears little discussion. Defendants refer vaguely to the contract without citing any language in it that would establish such a privilege. Furthermore, they offer no proof that Harrell or Fountain of Youth were parties to the contract.

11

Likewise, the district court made extensive findings of fact relating to the Medi-Weight job. Again, these findings of fact demonstrated that sufficient circumstantial evidence existed for the jury to find that Harrell tortiously interfered.[2] The facts presented at trial established that Kissinger-Campbell had a serious interview with Dr. Zbella. Additionally, the testimony of Gamaras that Harrell admitted to her that "plaintiff had gotten a job or she had gotten a job at the Medi-Weight Loss Clinic or was seeking a position there, and *he made sure she didn't get it*" was strong evidence. This was evidence on the basis of which the jury could have found that Kissinger-Campbell either had a job offer or had an understanding with Medi-Weight which would have been completed had Harrell not interfered. On that basis, the jury could have found that Harrell prevented Kissinger-Campbell from getting the job in question. Once again, it was not necessary for Kissinger-Campbell to elicit testimony from the person who ultimately decided whether to hire her because sufficient evidence had already been presented.

B. Defendants' hearsay challenge

---

[2]     The jury's verdict does not indicate whether they found for Kissinger-Campbell on the basis of one or both jobs. This Court need only find sufficient evidence as to one business relationship to affirm. Regardless, we find that sufficient evidence was produced as to both claims.

Defendants claim that Kissinger-Campbell's testimony that she "was excited" was hearsay because it was an implied assertion; meaning that the statement indicated that Zbella told her something to make her believe that she had gotten the job. We decline to reach the issue of whether such an implied assertion is inadmissible because we find that, even if there were error, the error was harmless. At least four reasons support our conclusion.

First, the implied assertion is extremely weak. Although there could be an implication that Dr. Zbella said something to make plaintiff think she had an offer, a stronger inference is that plaintiff simply felt confident because she felt amply qualified and because she and the job were such a good fit. The jury could have understood the statement to mean something entirely different from what Defendants contend it was meant to convey.

Second, the impliedly asserted inference is also weak because precisely the same implication was already before the jury in the form of plaintiff's testimony that she interrupted her job search because she was confident of getting that job. Defendants do not allege that her testimony regarding her job search was hearsay. Even if the challenged testimony had not been admitted, there is still evidence that Plaintiff believed that she had gotten the job.

Third, the district court expressly told the witness in the presence of the jury, and contemporaneous with this testimony, that the witness was not supposed to report what Dr. Zbella said. Thus, the jury was clearly aware that it was inappropriate for Plaintiff to report anything that was discussed in the interview with Zbella. In order for the jury to have assumed that the testimony represented what Dr. Zbella said, it would have had to disregard the judge's instruction. The law presumes that juries follow the instructions of the judge.

Finally, there was strong evidence that Harrell had in fact interfered with Plaintiff, and had himself thought that Plaintiff either had an offer or was so close to obtaining an offer that it was his call which prevented her from getting the job. Gamaras's testimony was sufficiently strong that the weak inference asserted by Harrell pales into insignificance.

In light of the foregoing reasons, if the evidence was erroneously admitted, then that error was harmless.[3]

C. Defendants' challenges to the $35,000 mental or emotional damages

Defendants' claim that the emotional damages allegedly suffered by Kissinger-Campbell were non-compensatory is frivolous. The district court

---

[3]  It should be noted that the testimony in question is only relevant to the Medi-Weight claim. Even if this evidence had been excluded, it would not have affected the jury's deliberation with respect to the My Choice claim.

correctly ruled that Harrell waived this claim by not asserting it in his rule 50(a) motion. Defendants cite Peer v. Lewis, No. 06-60146-CIV, 2008 WL 2047978, at *11 (S.D. Fla. May 13, 2008), for the proposition that a damages award may be modified even if it is not objected to in a Rule 50(a) motion. However, that case involved an award of monetary compensation to a candidate who lost an election; a matter the court deemed a clear violation of law. Id. The instant claim is one of insufficiency of the evidence; a type of claim specifically distinguished by the Peer court. Id. ("The issue here is not one of sufficiency of the evidence. It is a purely legal issue: whether a party can recover tort damages on the premise that he or she would have won an election but for the defendant's tortious conduct.") Because Defendants did not include this claim in their original motion for judgment as a matter of law, it was waived.[4]

Additionally, Harrell's claim that this award was duplicative lacks merit. Harrell fails to make any specific arguments as to why the damages award was duplicative or how the award represented a windfall to Kissinger-Campbell. There is simply no evidence that the jury's award was improper.

---

[4]The district court was also correct in rejecting this claim on the merits. Harrell offers no argument for why the damages in this case should be deemed overly remote. There is sufficient evidence in this case to support the jury's determination that Harrell caused Kissinger-Campbell significant mental or emotional damage. Thus, there is no need for discussion of whether Defendants demonstrate plain error.

D. Defendants newly discovered evidence and fraud claims

Defendants contend that the District Court abused its discretion by not granting a new trial on the basis of newly discovered evidence, under Rule 60(b)(2). A motion seeking relief under 60(b)(2), based on newly discovered evidence, requires all of the following: (1) the evidence must be newly discovered since the trial; (2) the movant must have exercised due diligence in discovering the new evidence; (3) the evidence cannot be merely cumulative or impeaching; (4) the evidence must be material; and (5) the new evidence must be such that it would produce a different outcome in the underlying action. Waddell v. Hendry County Sheriff's Office, 329 F.3d 1300, 1309 (11th Cir. 2003); Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1316 (11th Cir. 2000). Review of a court's decision to deny a motion for a new trial on the basis of Rule 60(b)(2) is scrutinized for abuse of discretion. Toole, 235 F.3d at 1316.

As a preliminary matter, this claim may very well have been waived by Defendants' failure to assert a claim under Rule 60(b)(2) to the court below, though they did assert a similar claim under Rule 59. Regardless, the claim lacks merit because the Defendants did not exercise due diligence. To demonstrate due diligence, the moving party must show why he did not have the evidence at the time of the trial. 11 Wright & Miller, Federal Practice and Procedure, Civil § 2859

16

(2010). Thus, for example, the failure to locate a witness prior to trial, whom the movant later argues was important to the case, will be treated as a lack of due diligence. Id. This is precisely the situation here. Harrell was aware of the Medi-Weight claim no later than April, 2008 and very familiar with Dr. Zbella's position in the practice. He could easily have deposed Zbella and discovered the identity of Sharon DeLuca. Defendants offer no convincing argument that they were unable to obtain the testimony in question from Zbella or DeLuca at trial. Their argument that they were not on notice that this testimony was important is unpersuasive. Also unpersuasive is their argument that they showed diligence by attempting to subpoena Zbella during trial. Simply put, Defendants could have (and potentially should have) procured before or during trial the testimony that they now seek to present. They failed to do so.

Defendants also argue that the jury's verdict should be set aside due to fraud perpetrated by Plaintiff. Rule 60(b)(3) allows a district court to "relieve a party or its legal representative from a final judgment, order, or proceeding [based on] fraud . . . misrepresentation, or misconduct by an opposing party. To prevail on a 60(b)(3) motion, the movant must present clear and convincing evidence that an adverse party has obtained a verdict through fraud, misrepresentation, or other misconduct." Cox Nuclear Pharmacy, Inc. v. CTI, INC., 478 F.3d 1303, 1314 (11th

17

Cir. 2007). The "conduct complained of must be such as prevented the losing party from fully and fairly presenting his case or defense." Rozier v. Ford Motor Co., 573 F.2d 1332, 1339 (5th Cir. 1978).

Harrell argues that Kissinger-Campbell incorrectly stated the date of her interview with Dr. Zbella, intentionally perjuring herself in order to make it appear that she was applying for a position different from the one that DeLuca was hired to fill. The argument seems to turn on a question of fact, whether the date of the interview was that testified to by Kissinger-Campbell or that now belatedly asserted by Defendants. Rule 60(b)(3) "is aimed at judgments which were unfairly obtained, not at those which are factually inaccurate." Id. "Factually incorrect judgments are the subject of Rule 60(b)(2)." Id. at 1339 n.4. Defendants fail to produce clear and convincing evidence of fraud. The testimony of Zbella and DeLuca merely indicates that there are conflicting accounts on precisely when certain past events occurred. This is not evidence of perjury or a conspiratorial scheme to concoct a false story, as Defendants allege.

Likewise, Defendants' assertion of a fraud in the form of false testimony regarding emails is not supported by clear and convincing evidence. Plaintiff's correspondence with potential employers was not foreseeably relevant when she filed her first suit, a Fair Labor Standards Act overtime case. And by the time the

18

emails had apparent relevance, they had been deleted as a routine matter. Furthermore, the references to emails that were made at trial were either not made in front of the jury or were made as vague references to Kissinger-Campbell's ability to speak to people she had networked with in the industry. There is not clear and convincing evidence that the failure to produce such emails prevented Defendants from fully and fairly presenting their case.[5]

For the foregoing reasons, the judgement of the district court is **AFFIRMED.**

---

[5]Defendants claim for the first time in their reply brief that the testimony of Gamaras can be discarded as inherently incredible. Although the argument is without merit, we decline to address this and other arguments that are raised for the first time in a reply brief. United States v. Jernigan, 341 F.3d 1273, 1284 n.8 (11th Cir. 2003). Allowance of such arguments would be inherently prejudicial to the Appellee, who is not given an opportunity to brief a response.